T.C. Memo. 1998-127


UNITED STATES TAX COURT


CHEN C.AND VICTORIA R. WANG, ET AL.,[1] Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 10511-94, 10512-94,        Filed March 31, 1998.
            19176-94, 19177-94,
             3857-95,  3858-95.


    <u>Martin A. Schainbaum</u>, for petitioners.

    David B. Porter (specially recognized), for petitioners.

    <u>Patricia A. Golembiewski</u> and <u>Thomas G. Schleier</u>, for
respondent.

_____

    [1]Cases of the following petitioners are consolidated here-
with: EIC Group, Inc. and Subsidiary, docket No. 10512-94; EIC
Group, Inc. and Subsidiaries, docket No. 19176-94; Chen C. and
Victoria R. Wang, docket No. 19177-94; Chen C. and Victoria R.
Wang, docket No. 3857-95; and EIC Group, Inc. and Subsidiaries,
docket No. 3858-95.

MEMORANDUM FINDINGS OF FACT AND OPINION

FAY, Judge:  These consolidated cases involve the following determinations by respondent of deficiencies in, and penalties on petitioners' Federal income taxes:

Docket Nos. 10511-94, 19177-94, 3857-95
        Chen C. & Victoria R. Wang

| Year | Deficiency | Penalty Sec. 6662(a) |
|------|-----------|----------------------|
| 1989 | $76,529 | $15,306 |
| 1990 | 398,475 | 79,695 |
| 1991 | 7,309 | 1,461 |

Docket Nos. 10512-94, 19176-94, 3858-95
        EIC Group, Inc. and Subsidiaries

| Year | Deficiency | Penalty Sec. 6662(a) |
|------|-----------|----------------------|
| 1989 | $5,469,221 | $1,093,844 |
| 1990 | 1,919,053 | 383,811 |
| 1991 | 977,776 | 195,555 |
| 1992 | 1,171,312 | 234,262 |

All section references are to the Internal Revenue Code in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

These cases were consolidated for trial, briefing, and opinion.  Prior to trial, the parties settled a number of

issues.[2]  As a result, the deficiencies now asserted by respondent have been reduced from those set forth in the notices of deficiency.  After concessions, the issues remaining for decision are:

1.    Whether petitioners improperly elected to use the installment method of accounting to report income from sales of real property; and, if the elections were improper, whether petitioners should use the accrual method as determined by respondent or the cost recovery method advocated by petitioners;[3]

2.    whether petitioner Chen C. Wang's closely held corporation, EIC Group, Inc. (EIC), is entitled to deduct as reasonable compensation commissions of $901,428 and a bonus of $500,000 paid to Chen C. Wang in 1989 and 1990, respectively;

3.    whether expenditures of $550,663 made in 1990 by EIC for the benefit of the Wangs represent loans to the Wangs or constructive dividends; and

4.    whether petitioners are liable for the accuracy-related penalties under section 6662(a).

---

[2]In connection with the settlements, the parties filed with the Court the first stipulation of settled issues, followed by the second, third, fourth, fifth, sixth, and seventh stipulations of settled issues.

[3]If we find that petitioners must use the accrual method, there are several subissues concerning the proper calculation of income under the accrual method.  See infra discussion.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, the first supplemental stipulation of facts, the second supplemental stipulation of facts, and the exhibits attached thereto are incorporated herein by this reference. Petitioner Chen C. Wang (petitioner) and his wife, petitioner Victoria R. Wang, resided in Woodside, California, at the time their petitions were filed. At the time its petitions were filed, the principal place of business for EIC was located in Redwood City, California.

Petitioner moved to the United States from Taiwan nearly 40 years ago. He has a degree in electrical engineering from San Jose State University and a Masters in Business Administration from the University of California at Berkeley. After completing his education, petitioner went to work for IBM. While at IBM, petitioner investigated ways to increase his income, and he ultimately decided that the best way to make money was to invest in real estate. Thereafter, petitioner began investing in real estate, eventually leaving IBM to devote more of his time and energy to increasing his real estate business. In 1982, petitioner incorporated EIC and used it as the vehicle to effectuate his real estate investment strategy. Nevertheless, occasionally petitioner personally purchased and sold land for his own account.

Petitioner's real estate strategy focused on purchasing raw, undeveloped land and reselling it to investors. Typically, petitioner advised his investors that they would have to hold the land at least 7 to 10 years in order to realize profitable returns. Petitioner believed that the most profitable land was located on the outskirts of a large metropolitan center. Based on this belief, during the years at issue, petitioner had decided that the land with the best investment potential was located in Lancaster, California, and Palmdale, California, areas well outside of Los Angeles. Petitioner felt that this land was well positioned, given the expected population growth for Los Angeles.

The property petitioner purchased in Lancaster and Palmdale was generally flat, semi-arid, undeveloped land. At one time, the land may have been used as farmland, but, by 1989 it had reverted to desert. The land was zoned for agricultural use, with a density that allowed for one house to be built on every 2 acres of land. There were no improvements to or on the land petitioner purchased, such as utilities, streets, curbs, or gutters. The land was not subdivided, but simply consisted of "raw" land in the desert described by metes and bounds.

Typically, either petitioner or EIC would acquire the raw land by paying 10 or 20 percent down, and giving the seller a note for the balance. Then petitioner would sell the land at a substantial markup in what was described at trial as the "retail

land market".  The markup could range anywhere from 4 to 6 times the amount paid for the land.  The buyer would make a sizeable downpayment to EIC and take the property subject to an all-inclusive deed of trust.  An all-inclusive deed of trust includes the promissory note made by EIC in favor of the original seller. Under this arrangement, as the buyer made payments on the promissory note to EIC, a part of the payment was used by EIC to make the payments due on EIC's promissory note given to the original seller.  EIC also used what is termed an "agreement of sale".  An agreement of sale is different than a trust deed because, unlike a trust deed, the agreement of sale is not recorded.  Rather, in the agreement EIC simply promised to transfer the deed to the buyer at some future time, presumably after the buyer had made all the payments due on its promissory note to EIC.

The promissory notes held by EIC were secured by the land. As outlined supra, typically EIC or petitioner would purchase large parcels of real estate and then sell undivided interests in the property to various investors.  These fractional interests were less attractive as security because an owner would have to receive the consent of the remaining property owners before making use of the property.  However, it appears that people who purchased land from EIC only held it as an investment, and few buyers, if any, actually built any structures on, or made any improvements to the property.

During the years at issue, petitioner and his wife owned approximately 98 percent of the stock in EIC. Further, during this period, petitioner was the chief executive officer, chairman, and, except for a brief period, the president of EIC. Since its inception, Mrs. Wang has been the secretary, treasurer, and chief financial officer of EIC. Petitioner typically worked 10 hours a day, 6 days a week. Petitioner is very driven, and he is involved with nearly every sale transaction that occurs at EIC.

The success enjoyed by EIC and petitioner is a reflection of petitioner's industry and dedication. Revenues reported in EIC's financial statements grew from $4,118,262 in 1985 to $29,411,411 in 1989, while assets grew from $23,343,200 to $46,231,210. Recent promotional materials for EIC indicate that the company owns investment property worth in excess of $60,000,000, and that investors have enjoyed an average annual appreciation of 25.9 percent on their investments, based on a sampling of prices over a 15-year period. At the peak of operations, approximately 12 people were employed at EIC's headquarters full time. In addition, there were 11 branch offices located throughout California, and as many as 50 sales agents worked at these branches. Most of the agents were independent contractors, although a few were classified as employees of EIC.

The market for raw land suffered a downturn in 1990. However, EIC was able to continue selling land despite this down-

turn. Companies that were able to sell land, like EIC, did so by developing superior marketing techniques or by utilizing connections with overseas buyers.

Accounting Methods

EIC keeps its books and records on the accrual basis for the purpose of preparing its financial statements. For tax purposes, during the years in issue, EIC and petitioner elected to use the installment method for reporting income in their tax returns.

This is the second instance where petitioner has been involved in litigation before the Tax Court. Previously, respondent issued petitioner and Mrs. Wang notices of deficiency for their 1979 and 1980 Federal income tax returns. The most significant portion of the deficiencies for the 2 years related to the income and expenses respondent determined in connection with the Wangs' land sales activities. Petitioner and Mrs. Wang presented these issues to this Court in a trial that was held on November 30, 1989, and December 1, 1989. However, no opinion was issued because all of the issues were resolved by the parties after the trial. The parties executed a closing agreement on final determination covering specific matters for the 1979 tax year (the 1979 closing agreement).[4] A decision was entered

---

[4]No closing agreement was executed for the 1980 tax year. The following constitutes the closing agreement for 1979:

WHEREAS, taxpayers' 1979 income tax return, Docket No.
(continued...)

pursuant to the terms of the 1979 closing agreement.

Petitioner and Mrs. Wang timely filed their 1989 Federal income tax return, which was received by the Internal Revenue Service on October 11, 1990. On their 1989, 1990, and 1991 Federal income tax returns, the Wangs elected to use the

_____

[4](...continued)
11281-83, is currently before the United States Tax Court;

WHEREAS, the proceeds from sales of real estate in 1979 were not fully recognized in 1979 or later years;

WHEREAS, the parties hereto wish to determine with finality the taxpayers' tax liability for the tax year 1979 and the timing of the recognition of the gains from those 1979 real estate transactions;

NOW IT IS HEREBY DETERMINED AND AGREED for Federal income tax purposes, that:

(1) there will be no recognition of the gain from the disputed sales of real estate in 1979;

(2) there is no tax due from, nor refund due to, the taxpayers for the tax year 1979;

(3) taxpayers are to recognize the gains from the disputed 1979 sales of real estate, resulting in increases to their income of $1,369,723 on the corporate income tax returns of EIC Group, Inc. as follows:

(a) $500,099.50 income is to be included in the tax year 1989;

(b) $500,099.50 income is to be included in the tax year 1990;

(c) $369,524.00 is to be reported in the year it is paid by the buyer to, or for, the taxpayer;

(4) there are no other items of income nor expense to be included as income, or taken as a deduction, with respect to the 1979 real estate transactions except as stated in (3) above.

installment method of accounting to report income from land sales. EIC also elected to report income based upon the installment method. However, in October 1994, the Wangs filed an amended return for 1990, while EIC filed amended returns for the years 1990 and 1992 in September and June of 1994, respectively. On these amended returns, the Wangs and EIC reported income from land sales based on the cost recovery method of accounting. To date, neither petitioner nor EIC has submitted to respondent a Form 3115 requesting a change in their accounting method.

Transactions between the Wangs and EIC

As discussed, supra, the financial success of EIC is due in large part to the efforts of petitioner and Mrs. Wang. Over the years, the Wangs have been compensated for their hard work. Petitioner and Mrs. Wang each received salaries of $223,250, $283,200, and $114,417 from EIC in 1989, 1990, and 1991, respectively. Furthermore, in 1990, EIC paid petitioner a bonus of $500,000.

Petitioner has maintained a broker's license since the early 1970s, and he regularly acted as the broker in land sales involving EIC. A number of independent agents also worked with EIC in selling land.

EIC dealt almost exclusively in the purchase and sale of raw land. Real estate agent commissions on sales of raw land are significantly higher than those paid in connection with a sale of

improved real estate.  In fact, EIC typically paid commissions that were between 10-15 percent of the sales price.  During 1989, on average, EIC paid commissions of 13 percent.

Often, more than one agent would be involved with a particular sale.  In these cases, petitioner allocated the 13-percent commission among the sales agents who participated in the sale, based upon each agent's level of participation.  Petitioner is an experienced sales agent, however, and many times he would be the only person involved in a sale by EIC.  In those circumstances, EIC paid the full 13-percent commission to petitioner alone.  For 1989, petitioner received $901,428 in commissions from EIC, and EIC claimed a deduction for this amount.

During the years in issue, the financial relationship between petitioner and EIC was not limited to the compensation paid to petitioner.  In fact, EIC's financial statements as of December 31, 1989, disclose both "notes receivable" from petitioner in the amount of $873,194 as well as "notes payable" to petitioner in the amount of $1,010,895.  These amounts comport to the figures reported in EIC's December 31, 1989, corporate income tax return.  EIC maintained separate accounts in its general ledger to track funds transferred to petitioner and funds received from petitioner.  As of December 31, 1990, the corporate income tax return for EIC reported "Loans from Stockholders" of $1,312,199 and "Loans to Stockholders" of $1,717,892.  The

minutes of EIC's 1990 and 1991 annual board of director's meetings reflect the board's formal approval and ratification of the corporation's borrowing money from, and loaning money to, petitioner and Mrs. Wang.

## The Notices of Deficiency

Initially, EIC's 1989 corporate income tax return was selected for audit. The revenue agent first contacted EIC personnel in December 1992. After the revenue agent reviewed some of the information obtained from the initial document request and identified EIC's accounting method as a potential issue, the examination was expanded to include the years 1990 and 1991 for EIC, as well as the Wangs' personal Federal income tax returns for 1989 through 1991. Some time later, EIC's 1992 corporate tax return was also opened for examination.

By 1994, the revenue agent had identified a large number of potential issues in EIC's corporate tax returns and the Wang's individual returns. However, the various statutory periods of limitations were near their expiration dates, and petitioners refused to grant extensions to respondent. Consequently, at different times from February 1994 through February 1995, respondent issued a statutory notice of deficiency for each year under audit. As a result, the notices of deficiency contained numerous items that could have been resolved in the examination. For instance, the notice of deficiency relating to EIC's 1990 tax

return lists 21 items of adjustment, many of them due to lack of substantiation. Many of the adjustments determined in the notices of deficiency have been resolved by the parties through numerous stipulations of settled issues.

The following determinations made by respondent in the notices of deficiency remain in dispute. First, respondent determined that the accounting method used by EIC and the Wangs in the returns as originally filed was improper. Respondent further determined that they should report income using the accrual method, which is the method used for their financial books and records. Second, respondent determined that the $901,428 in commissions for 1989, and the $500,000 bonus paid to petitioner in 1990, represented unreasonable compensation and therefore were not deductible by EIC. Third, respondent determined that, for 1990, expenditures made by EIC on behalf of the Wangs, reported as loans, were in reality disguised dividends and, accordingly, were includable in petitioner's income. Finally, respondent determined that petitioners are liable for the accuracy-related penalties under section 6662(a).

OPINION

Issue 1. Method of Accounting

The first issue for decision requires us to decide the proper method of accounting for calculating gain on the sales of real property. EIC and the Wangs originally selected the

installment method to report income for tax purposes from the sales of land. In the notices of deficiency issued to EIC for the taxable years 1989 through 1992, and to the Wangs for 1990, respondent determined that the installment method was an impermissible method of accounting for tax purposes, and determined that the accrual method was one that clearly reflected income. Petitioner and EIC argue that the installment method is proper, and therefore respondent improperly changed their accounting method from one that clearly reflected income.

Section 446(a) requires a taxpayer to compute taxable income under the method of accounting it regularly uses in keeping its books. Section 446(b), however, provides that, if the method of accounting regularly utilized by the taxpayer does not clearly reflect taxable income, the computation of taxable income shall be made under such method as, in the Commissioner's opinion, does clearly reflect income. The Commissioner's authority under section 446(b) reaches not only overall methods of accounting but also a taxpayer's method of accounting for specific items of income and expense. Ford Motor Co. v. Commissioner, 102 T.C. 87, 100 (1994), affd. 71 F.3d 209 (6th Cir. 1995); sec. 1.446-1(a), Income Tax Regs.

It is well recognized that section 446 grants the Commissioner broad discretion in matters of accounting and gives the Commissioner wide latitude to adjust a taxpayer's method of

accounting so as to reflect income clearly. United States v. Hughes Properties, Inc., 476 U.S. 593, 603 (1986); Commissioner v. Joseph E. Seagram & Sons, Inc., 394 F.2d 738, 743 (2d Cir. 1968), revg. 46 T.C. 698 (1966). To prevail in a dispute over the Commissioner's determination on an accounting matter, a taxpayer must establish that the determination is "clearly unlawful" or "plainly arbitrary." Thor Power Tool Co. v. Commissioner, 439 U.S. 522, 532-533 (1979) (quoting Lucas v. American Code Co., 280 U.S. 445, 449 (1930), and Lucas v. Structural Steel Co., 281 U.S. 264, 271 (1930)).

Nonetheless, where a taxpayer's method of accounting does clearly reflect income, the Commissioner cannot require the taxpayer to change to a different method even if the Commissioner's method more clearly reflects income. Ford Motor Co. v. Commissioner, 71 F.3d at 213; Ansley-Sheppard-Burgess Co. v. Commissioner, 104 T.C. 367, 371 (1995); Molsen v. Commissioner, 85 T.C. 485, 498 (1985). We limit our inquiry to whether the accounting method at issue clearly reflects income, and we do not decide whether one method is superior to other possible methods. RLC Indus. Co. v. Commissioner, 98 T.C. 457, 492 (1992), affd. 58 F.3d 413 (9th Cir. 1995); see also Brown v. Helvering, 291 U.S. 193, 204-205 (1934).

During the years at issue, EIC bought and sold undeveloped real property in the outlying areas of Los Angeles and elected to

use the installment method to report gains from sales of this property. In 1990, petitioner and Mrs. Wang engaged in the same type of sales activity as EIC with property held in their own names. Like EIC, the Wangs elected to report gains on the installment method.

The installment sales provisions are contained in section 453. Section 453(a) permits a taxpayer to report income from an "installment sale" under the "installment method." Under the "installment method", a proportionate amount of income is recognized in the year when a payment is received. Sec. 453(c).

An "installment sale" is defined as a "disposition of property where at least 1 payment is to be received after the close of the taxable year in which the disposition occurs." Sec. 453(b)(1). However, an "installment sale" does not include a dealer disposition of property. Sec. 453(b)(2)(A). A dealer disposition includes a disposition of real property which is held by the taxpayer in the ordinary course of his trade or business. Sec. 453(l)(1)(B)[5]. The sale of a residential lot in the

_____

[5]Sec. 453(l) defines the term "dealer disposition" for the purposes of the installment sales rules. That section provides in part:

(l)  Dealer Dispositions.--For purposes of subsection (b)(2)(A)--

(1)  In general.--The term "dealer disposition" means any of the following dispositions:

(continued...)

---

[5](...continued)

    (A) Personal property.--Any disposition of personal property by a person who regularly sells or otherwise disposes of personal property of the same type on the installment plan.

    (B) Real property.--Any disposition of real property which is held by the taxpayer for sale to customers in the ordinary course of the taxpayer's trade or business.

(2)   Exceptions.--The term "dealer disposition" does not include--

    (A) Farm property.--The disposition on the installment plan of any property used or produced in the trade or business of farming (within the meaning of section 2032A(e)(4) or (5)).

    (B) Timeshares and residential lots.--

        (i) In general.--Any dispositions described in clause (ii) on the installment plan if the taxpayer elects to have paragraph (3) apply to any installment obligations which arise from such dispositions. An election under this paragraph shall not apply with respect to an installment obligation which is guaranteed by any person other than an individual.

        (ii) Dispositions to which subparagraph applies.--A disposition is described in this clause if it is a disposition in the ordinary course of the taxpayer's trade or business to an individual of--

            (I) a timeshare right to use or a timeshare ownership interest in residential real property for not more than 6 weeks per year, or a right to use specified campgrounds for recreational purposes, or

(continued...)

ordinary course of a taxpayer's business is not considered a dealer disposition. Sec. 453(l)(2)(B)(ii)(II).

Petitioners do not dispute that they were dealers in real property.[6] However, the Wangs and EIC argue that they satisfy the exception for sales of residential lots. Respondent asserts that the land petitioner and EIC sold was not residential property, because EIC's buyers never intended to build homes on the property they purchased from EIC. Petitioner argues that the land was zoned in such a way that the buyers could have built a house on the property if they had desired to do so. Based upon the evidence and the following analysis, we agree with respondent.

With the Tax Reform Act of 1986, Pub. L. 99-514, sec. 811, 100 Stat. 2365, Congress enacted section 453C which generally denied installment sale treatment to dealer dispositions of property but provided an exception for sales of residential lots. See sec. 453C(e)(4)(A)(i)(II), applicable to sales between March 1, 1986, and December 31, 1987. The Omnibus Budget

---

[5](...continued)

> (II) any residential lot, but only if the taxpayer (or any related person) is not to make any improvements with respect to such lot.

[6]In fact, in their respective petitions, both petitioner and EIC state that they are dealers in real estate.

Reconciliation Act of 1987 (the 1987 Act), Pub. L. 100-203, sec. 10202, 101 Stat. 1330-388, repealed section 453C for sales after December 31, 1987. However, the 1987 Act created section 453(l), which contains language nearly identical to that found in section 453C concerning the denial of installment sales treatment for dealer dispositions, with an exception for sales of residential lots. See 1987 Act sec. 10202(b)(2), 101 Stat. 1330-388. Thus, in repealing section 453C and enacting section 453(l), Congress did not alter the treatment for installment obligations arising from the sale of residential lots. H. Conf. Rept. 100-495 at 927 (1987), 1987-3 C.B. 193, 207.

Respondent has not issued regulations in connection with section 453(l) but previously had issued temporary regulations for the now-repealed section 453C. Since the relevant language in section 453(l) is identical to that used in section 453C, we turn to the regulations under section 453C for guidance in interpreting the term "residential lots" contained in section 453(l)(2)(B).

Section 1.453C-8T(4), Temporary Income Tax Regs., 53 Fed. Reg. 34725 (Sept. 8, 1988), defines a residential lot as "a parcel of unimproved land upon which the purchaser intends to construct (or intends to contract to have another person con- struct) a dwelling unit for use as a residence by the purchaser." Petitioner argues that the land sold by EIC was zoned such that a

buyer would be permitted to construct a house on the property if a buyer so desired. While this fact is relevant to our decision, for the following reasons we nonetheless conclude that the land sold by petitioner and EIC does not satisfy the residential real estate exception for dealer dispositions.

It is abundantly clear that the land sold by EIC was marketed to potential buyers as a speculative investment. The offering materials exclusively focused on financial factors such as return on investment, capital preservation (safety), and tax considerations. Further, petitioner testified that neither he nor EIC has ever represented to potential buyers that the land being sold was suitable for use as residential lots. There is no evidence in the record to suggest that buyers purchased land from petitioner or EIC with the intention of building dwelling units on that land. In fact, the overwhelming weight of evidence strongly suggests that no buyer ever constructed a dwelling unit on land purchased from EIC or petitioner. We therefore find that buyers did not purchase land from petitioner or EIC with the intent to construct a dwelling unit on the property. Accordingly, we conclude that petitioner and EIC improperly elected to use the installment sales method for reporting gain because they are dealers in real estate and they failed to satisfy the residential real estate exception for dealer dispositions contained in section 453(l)(2)(B).

Petitioner also makes a second argument that the cost recovery method is the proper method for reporting gain from the sales of land.  In this regard, petitioner notes that the Wangs and respondent used the cost recovery method to compute the income contained in the 1979 closing agreement.  Petitioner contends that both parties are now bound by the 1979 closing agreement to use the cost recovery method.

Respondent answers that EIC and petitioner failed to file a Form 3115 when changing from the installment method to the cost recovery method used in the amended income tax returns.  Taxpayers are required to use this form in requesting the Commissioner's consent to changes in accounting methods.  Sec. 1.446-1(e)(3)(i), Income Tax Regs.; Rev. Proc. 84-74, 1984-2 C.B. 736.  Respondent asserts that petitioners' failure to follow established procedures is sufficient to deny their attempt to change accounting methods.  We agree.  See Witte v. Commissioner, 513 F.2d 391 (D.C. Cir. 1975), revg. in part and remanding T.C. Memo. 1972-232.

Petitioner argues, however, that the use of the cost recovery method is mandated by the 1979 Closing Agreement, thereby obviating the need to file a Form 3115 and requesting the Commissioner's consent.  The facts do not support petitioner's contentions.

The Secretary of the Treasury is authorized to enter into written closing agreements with respect to the tax liability of any person for any taxable period. Sec. 7121(a). Such closing agreements are binding on the parties as to the matters agreed upon and may not be annulled, modified, set aside, or disregarded in any suit or proceeding unless there is a showing of fraud, malfeasance, or misrepresentation of a material fact. Sec. 7121(b); Rink v. Commissioner, 100 T.C. 319, 324 (1993), affd. 47 F.3d 168 (6th Cir. 1995). A closing agreement is binding only as to matters agreed upon for the taxable period stated in the agreement. Estate of Magarian v. Commissioner, 97 T.C. 1, 4 (1991). Ordinary principles of contract law govern the interpretation of closing agreements. Rink v. Commissioner, supra at 325. These principles generally direct courts to look within the "four corners" of the agreement, unless it is ambiguous as to essential terms. Id.

Petitioner's own witnesses at trial were unable to discern the method used for calculating the income in the 1979 closing agreement by merely reviewing the agreement. The words "cost recovery method" are not present in the 1979 closing agreement. Further, not one word of the 1979 closing agreement is devoted to the purportedly agreed upon method for reporting income in future years.

Petitioner and EIC used the installment method to report income in tax returns that were filed after the 1979 closing agreement was executed.  This seriously undercuts petitioner's contention that the parties intended that the 1979 closing agreement would require them to use the cost recovery method in future years.  See Pacific Portland Cement Co. v. Food Mach. & Chem. Corp., 178 F.2d 541, 554 (9th Cir. 1949) (when interpreting a contract, a court may look to the parties' actions in ascertaining their intent).  Therefore, we find that the 1979 closing agreement does not cover the method for reporting income during the years at issue.

Based on the foregoing, we conclude that the attempts by petitioner and EIC to change accounting methods by filing amended tax returns are ineffectual.  After determining that the Wangs and EIC used an impermissible accounting method to report income, respondent may change their method of accounting to any method that, in respondent's opinion, clearly reflects income.  Sec. 446(b).  Petitioner does not argue that respondent's use of the accrual method is "clearly unlawful" or "plainly arbitrary." Thor Power Tool Co. v. Commissioner, 439 U.S. 522, 532-533 (1979) (quoting Lucas v. American Code Co., 280 U.S. 445, 449 (1930), and Lucas v. Structural Steel Co., 281 U.S. 264, 271 (1930)). Accordingly, we sustain respondent's determination that peti-

tioner and EIC must report income based on the accrual method of accounting.

Since we have concluded that petitioner and EIC must report income on the accrual method, there are a number of derivative computational issues that we must address. First, in the second stipulation of settled issues, the parties indicate that they have not reached an agreement as to the proper amount of income EIC must report in 1989 under the accrual method. Respondent determined in the notice of deficiency dated April 1, 1994, that the income is $19,584,214, while EIC contends it is $18,850,859. After a concession of $100,000, respondent now contends that the income should be $19,484,214. Petitioner has failed to adequately address this issue on brief[7] or otherwise. As a

_____

[7]In petitioners' reply brief, with respect to the different calculations of accrual income, petitioner states "We maintain that the parties must abide by the stipulations they previously executed." The second stipulation of settled issues presents the parties' computation of accrual income for EIC as follows:

Income To Be Reported by Petitioner EIC

| Year | Cost Recovery Method | Installment Method | Accrual Method |
|------|----------------------|--------------------|----------------|
| 1989 | $4,968,292 | $10,093,843 | To Be Determined |
| 1990 | 3,230,695 | 5,506,844 | $9,990,901 |
| 1991 | 3,253,218 | 3,072,503 | 2,801,850 |
| 1992 | 2,213,590 | 1,978,872 | 670,700 |

In the stipulation, the parties indicate that the proper amount of accrual income for 1989 will be presented to the Court for

(continued...)

consequence, we conclude EIC did not meet its burden and find that the proper amount of income for 1989 under the accrual method is $19,484,214.

Second, respondent contends in the second stipulation of settled issues that EIC is required to report the following income from sales that occurred prior to March 1, 1986:

| Year | Amount of Adjustment |
|------|---------------------|
| 1989 | $337,668 |
| 1990 | 418,548 |
| 1991 | 292,745 |
| 1992 | 291,437 |

EIC contends that it does not have to report any income from sales that occurred prior to March 1, 1986. However, a witness for EIC, Michael Cummins, a C.P.A. who had served as EIC's interim controller, testified on cross-examination that EIC would have to report these amounts if the accrual method were found to be the proper method of accounting. EIC did not address this issue in its opening brief nor its reply brief. Accordingly, we treat this as a concession by EIC and find for respondent.

Third, the parties disagreed in the fourth stipulation of settled issues as to the proper amount of income that the Wangs

---

[7](...continued)
resolution. Nevertheless, on brief, petitioners do not further address the differences between their calculation of accrual income and the amount determined by respondent.

should report under each of the different methods of accounting.[8] Respondent has conceded $226,170 of the difference in the amount of income for 1990. Other than documents pertaining to the $226,170 conceded by respondent, petitioner did not put on any evidence nor make any arguments on brief concerning the remaining differences. We treat this as a concession by petitioner and Mrs. Wang, and find for respondent.

Issue 2. Reasonable Compensation

Section 162(a)(1) provides for a deduction for ordinary and necessary business expenses including "a reasonable allowance for salaries or other compensation for personal services actually

---

[8]The fourth stipulation of settled issues sets forth the following amounts as income from real estate sales under the accrual method:

Income to Be Reported by Petitioners Mr. & Mrs. Wang
(Per Petitioners' Computations)

| Year | Accrual Method |
| --- | --- |
| 1990 | $663,739 |
| 1991 | 168,545 |
| 1992 | -0- |
| Post-92 | -0- |

Income To Be Reported by Petitioners Mr. & Mrs. Wang
(Per Respondent's Computations)

| Year | Accrual Method |
| --- | --- |
| 1990 | $716,239 |
| 1991 | 183,141 |
| 1992 | -0- |
| Post-92 | -0- |

rendered". To fall within the ambit of section 162(a)(1), the compensation must be both reasonable in amount and paid purely for services. Sec. 1.162-7(a), Income Tax Regs. Typically, the deductibility of compensation turns on whether the compensation paid is reasonable in amount. Elliotts, Inc. v. Commissioner, 716 F.2d 1241, 1243-1244, (9th Cir. 1983), revg. and remanding T.C. Memo. 1980-282. EIC bears the burden of proving the reasonableness of compensation. Rule 142(a).

The reasonableness of compensation is a question of fact to be determined on the basis of all the facts and circumstances. Pacific Grains, Inc. v. Commissioner, 399 F.2d 603, 606 (9th Cir. 1968), affg. T.C. Memo. 1967-7. Many factors are considered in determining whether compensation is reasonable, and no single factor is decisive. Mayson Manufacturing Co. v. Commissioner, 178 F.2d 115, 119 (6th Cir. 1949), revg. a Memorandum Opinion of this Court. In Elliots, Inc. v. Commissioner, supra at 1245-1248, the Court of Appeals for the Ninth Circuit, the Court to which these cases are appealable, arranged these factors into five broad categories.

The first factor focuses on the employee's responsibilities and duties in the organization. Relevant considerations include petitioner's qualifications, hours worked, duties performed, as well as his importance to EIC's success. American Foundry v. Commissioner, 536 F.2d 289, 292 (9th. Cir. 1976), affg. in part

and revg. in part 59 T.C. 231 (1972). The second factor compares the employee's compensation with that paid by similar companies in similar industries for similar services. Elliotts, Inc. v. Commissioner, supra at 1246; see sec. 1.162-7(b)(3), Income Tax Regs. The third factor requires us to focus on EIC's size as indicated by its sales, or capital value, the complexities of the business, and the general economic conditions. Elliotts, Inc. v. Commissioner, supra at 1246. The fourth factor considers whether the relationship between the company and the employee whose compensation is at issue might permit the company to disguise nondeductible corporate distributions of income as compensation deductible under section 162(a)(1). Id. A potential for such abuse exists when the employee whose compensation is at issue is the company's sole or controlling shareholder. Charles Schneider & Co. v. Commissioner, 500 F.2d 148, 152-153 (8th Cir. 1974), affg. T.C. Memo. 1973-130; sec. 1.162-7(b)(1), Income Tax Regs. The fifth factor focuses on whether the compensation was paid pursuant to a structured, formal, and consistently applied program. Bonuses not paid pursuant to such plans are suspect. Elliotts, Inc. v. Commissioner, supra at 1247; Nor-Cal Adjusters v. Commissioner, 503 F.2d 359, 362 (9th Cir. 1974), affg. T.C. Memo. 1971-200. In the notices of deficiency, respondent determined that commissions of $901,428 paid to petitioner in 1989 and the $500,000 bonus paid to petitioner in 1990 were not

deductible by EIC because the payments did not constitute reasonable compensation. With the foregoing five factors in mind, we analyze the reasonableness of each payment.

The Commissions of $901,428 Paid in 1989

In EIC's notice of deficiency for 1989, respondent disallowed the $901,428 deduction for real estate commissions paid to petitioner. Respondent argues on brief that EIC has not produced evidence showing how it computed the commissions or explaining why the commissions were paid to petitioner. Petitioner responds that the commissions relate to specific sales, are consistent with the commissions paid to other salespeople, and are therefore reasonable and fully deductible.

Petitioner maintains a broker's license, and actively participated in many of the land sales by EIC during 1989. In fact, petitioner's experience and ability as a salesman contributed significantly to the success of EIC. If petitioner participated in a sale, he was eligible to receive a commission on the sale. If petitioner alone was responsible for making the sale, he received the full 13-percent commission; otherwise, the commission was allocated among all of the participants. The 13-percent rate of commission is standard in the industry for these types of land sales.

Considering the factors enumerated above, we conclude that it was reasonable to pay petitioner a commission for each sale in

which he participated.  Petitioner was compensated for his role as a salesman, and, as such, his activities and duties were comparable to those of other salespeople.  The record indicates that commissions paid by EIC conform with those typically paid in the industry and were paid to petitioner based upon a formal and consistently applied program.

Respondent argues that EIC has failed to adduce specific evidence concerning petitioner's actions relative to the sales on which he earned commissions.  Respondent posits that, because petitioner controlled EIC, he had the ability to pay himself the full commission on a sale, to the detriment of any other sales-person who might have worked on the sale.  We do not find merit in respondent's argument.  The record indicates that, on several occasions, petitioner split the commission on a sale with other salespeople.  Moreover, petitioner's ability to take the full commission on a sale is limited in those circumstances where other salespeople participated in the sale.  A salesperson who is losing commissions to petitioner would likely seek employment with another real estate dealer where commissions are not being appropriated by the business owner.

We are unable to find, however, that the commissions paid by EIC are reasonable in amount.  The commissions paid by EIC for land sales in 1989 are substantiated by a schedule which lists, in chronological order, all the land transactions for that year.

For each sale, the schedule allocates the commissions among the various salespeople, including petitioner.  While not clear, it appears that the schedule is produced from information contained in EIC's general ledger accounting program.  The schedule does not provide a summary of the total commissions paid to each individual salesperson, but when added together, all of petitioner's individual commissions for 1989 amounted to $506,986.  Near the bottom of the schedule, there are journal entries totaling $901,428, the amount actually paid to petitioner.  The journal entries, made at year end, do not reference any particular sales (as all the other entries do), but instead contain the notations "all sales override" or "withdraw".  No explanation for these entries was given at trial.

On brief, EIC has not put forth any arguments concerning compensation paid to petitioner in 1989 other than to assert that the commissions were reasonable because they related to specific sales.  As previously noted, no evidence was presented at trial, nor was any argument made on brief, concerning the journal entries totaling $901,428.  Accordingly, based on the entire record before us, we conclude that $506,986 represents a reasonable amount of compensation to petitioner for his efforts in selling land for EIC in 1989.

The $500,000 Bonus Paid in 1990

In EIC's notice of deficiency for 1990, respondent disallowed a deduction for the $500,000 bonus paid to petitioner at yearend. Respondent argues on brief that the bonus was excessive and therefore not deductible as reasonable compensation under section 162(a). EIC responds that petitioner, a key employee at EIC, was instrumental in the corporation's success and entitled to higher compensation. EIC therefore concludes that the bonus was reasonable and fully deductible.

We agree with EIC that petitioner played an important role in the corporation's financial success. Petitioner was a central figure in managing the corporation and worked long hours to increase its business. Nevertheless, on the basis of the record before us, we are unable to conclude that EIC has successfully demonstrated that the bonus was reasonable in amount.

EIC has not related the bonus to any duties performed by petitioner. The record indicates that petitioner's administrative functions with respect to EIC remained constant throughout the years at issue, while petitioner's 1990 salary of $283,200 exceeded the salary he received in other years. Thus, the bonus did not serve to compensate petitioner for any unusual activities in connection with his administrative functions. Additionally, no evidence was presented, nor any argument made, that this bonus was derived from specific sales generated by petitioner.

A number of the factors enumerated by the Court of Appeals for the Ninth Circuit weigh against EIC. EIC is a closely held corporation, controlled by petitioner, which did not pay any dividends for the year. This presents the textbook case of a corporation with the opportunity to disguise nondeductible corporate distributions of income as compensation. There is no evidence to indicate that EIC paid any bonuses to any other employees nor evidence to suggest that the bonus in question was paid according to a structured, formal, and consistently applied program. EIC has not put on any evidence, through expert testimony or otherwise, that compares the compensation paid by EIC with that paid by companies in similar industries for similar services. Accordingly, we conclude that EIC has not met its burden in demonstrating that compensation paid to petitioner in excess of his $283,200 salary was reasonable in amount and therefore find that the $500,000 bonus is not deductible under section 162(a).

Issue 3. Loan or Constructive Dividend

During 1990, EIC made expenditures totaling $550,663 for personal expenses of the Wangs. The amounts so expended were recorded as loans to shareholders in EIC's general ledger. Respondent determined that these payments did not constitute bona fide loans and instead were constructive dividends to the Wangs.

We must determine whether payments made by EIC for the benefit of petitioner and Mrs. Wang constitute loans, as petitioner contends, or constructive dividends taxable under sections 301 and 316, as respondent contends. Sections 301 and 316 provide that a distribution of property made by a corporation with respect to its stock is a taxable dividend to the extent of the corporation's earnings and profits. Petitioner does not dispute that EIC had earnings and profits sufficient to support the constructive dividends determined by respondent.

Petitioner has the burden of proving that the amounts expended for his benefit are bona fide loans and not constructive dividends. Rule 142(a), Welch v. Helvering, 290 U.S. 111 (1933). Further, courts examine transactions between closely held corporations and their shareholders with special scrutiny. Turner v. Commissioner, 812 F.2d 650, 654 (11th Cir. 1987), affg. T.C. Memo. 1985-159; Electric & Neon, Inc. v. Commissioner, 56 T.C. 1324, 1339 (1971), affd. without published opinion sub nom. Jiminez v. Commissioner, 496 F.2d 876 (5th Cir. 1974).

Whether a distribution from a corporation to a shareholder constitutes a dividend or a loan depends on whether, at the time of the distribution, the shareholder intended to repay the amounts received and the corporation intended to require repayment. See Chism's Estate v. Commissioner, 322 F.2d 956, 959-960 (9th Cir. 1963), affg. Chism Ice Cream Co. v. Commissioner, T.C.

Memo. 1962-6; Miele v. Commissioner, 56 T.C. 556, 567 (1971),
affd. without published opinion 474 F.2d 1338 (3d Cir. 1973).
This determination is to be made based on all of the facts and
circumstances of the case. Chism's Estate v. Commissioner, supra
at 960. Statements of intent, absent objective indicia of debt,
are less persuasive in situations involving stockholders of a
closely held corporation. Turner v. Commissioner, supra at 654.

A court may look to a variety of factors to determine
whether there was an intent to make a loan. The following is a
nonexclusive list of the objective factors often considered in
deciding whether shareholder withdrawals from a corporation are
loans or constructive dividends:

(1) The taxpayer's degree of control over the corporation;

(2) the existence of restrictions on the amount of
disbursements;

(3) the corporate earnings and dividends history;

(4) the use of customary loan documentation, such as
promissory notes, security agreements or mortgages;

(5) the ability of the shareholder to repay;

(6) the treatment of the disbursements on the corporate
records and financial statements;

(7) the presence of conventional indicia of legal
obligations, such as payment of interest, repayment
schedules, and maturity dates;

(8)   the corporation's attempts to enforce repayment; and

(9)   the shareholder's intention or attempts to repay the
      loan.

See Busch v. Commissioner, 728 F.2d 945, 948 (7th Cir. 1984), affg. T.C. Memo. 1983-98; Dolese v. United States, 605 F.2d 1146, 1153 (10th Cir. 1979).  No single factor is determinative. Boecking v. Commissioner, T.C. Memo. 1993-497.  After considering all of the facts and circumstances, we conclude that the expenditures made by EIC on behalf of petitioner and Mrs. Wang constitute constructive dividends to the Wangs.

Several factors support our conclusion.  The Wangs have unfettered control over EIC, with the authority to make decisions concerning the timing and extent of payments made on their behalf.  See Epps v. Commissioner, T.C. Memo. 1995-297.  Despite the growth in corporate earnings, EIC did not pay a dividend during any of the years at issue, nor were any dividends dis- closed in the financial statements for prior years.  Nothing in the record indicates that there were any restrictions on the amount of money lent to the Wangs.  See Crowley v. Commissioner, 962 F.2d 1077, 1081 (1st Cir. 1992), affg. T.C. Memo. 1990-636. No loan documents, notes, or written instruments of indebtedness were presented to the Court.  Id. at 1082.  Further, there were no repayment schedules, maturity dates, or any indication that the Wangs made interest payments to EIC in connection with the

purported loans.  There is no evidence that EIC ever attempted to enforce repayment.  Additionally, there is no evidence that EIC either requested or received any security or collateral for the loans.  See <u>Zimmerman v. United States</u>, 318 F.2d 611, 613 (9th Cir. 1963).

Petitioner argues that, in later years, he and Mrs. Wang repaid some of the loans.  Petitioner directs our attention to EIC's Federal income tax returns for subsequent years, wherein the reported balance in the "Loans to shareholder" account decreased.  We are not persuaded that this evidence is sufficient to carry the day for petitioner.  No evidence was introduced concerning the form of the purported loan repayments made by petitioner.  Cases have discounted the significance of repayments that consisted merely of entries in the corporation's books, as opposed to cash transfers made by the shareholder.  Compare <u>Boecking v. Commissioner</u>, T.C. Memo. 1993-497 (shareholder's bonuses that were credited to the shareholder's loan account were simply bookkeeping entries and did not establish the existence of bona fide loans), with <u>M. J. Byorick, Inc. v. Commissioner</u>, T.C. Memo. 1988-252 (repayment is strong evidence that a bona fide loan exists).

Petitioner also argues that a debtor/creditor relationship existed throughout the years at issue.  He asserts that documentary evidence consisting of financial statements, minutes

of the board of directors, and corporate tax returns supports this contention. While consistent treatment on the books of the corporation is a factor to be considered, "book entries and records may not be used to conceal a situation which is not in economic reality what it is made to appear." Williams v. Commissioner, T.C. Memo. 1978-306, affd. 627 F.2d 1032 (10th Cir. 1980).

In conclusion, we find that the amounts expended by EIC for the benefit of the Wangs constitute constructive dividends. The purported loans originated because EIC paid personal expenses of the Wangs and charged the payments to the shareholder loan account. It is apparent the petitioners used the loan accounts to transfer money freely between EIC and the Wangs and, in effect, permitted the Wangs to use EIC as their personal checking account. The nature of the payments are further evidence that these transfers were not bona fide loans to the shareholder but rather were dividends fully taxable under sections 301 and 316. See Dolese v. United States, supra at 1154 (noting that the "timing and the pattern" of advances to the shareholder "cannot be ignored"). Accordingly, we sustain respondent's determination.

Issue 4. Accuracy Related Penalties

Section 6662(a) imposes a penalty in an amount equal to 20 percent of the portion of the underpayment of tax attributable to

one or more of the items set forth in section 6662(b). Respondent determined that the Wangs are liable for accuracy-related penalties pursuant to section 6662 for 1989, 1990, and 1991; EIC, for 1989-1992. Respondent asserts that the section 6662 penalties are due to either a substantial understatement of tax or negligence or disregard of the rules or regulations. Sec. 6662(b)(1) and (2). Petitioners bear the burden of proving that respondent's determination is erroneous and that they are not liable for the accuracy-related penalties. Rule 142(a); Bixby v. Commissioner, 58 T.C. 757, 791 (1972).

The term "negligence" includes a failure to make a reasonable attempt to comply with the provisions of the internal revenue laws. Sec. 6662(c); sec. 1.6662-3(b)(1), Income Tax Regs. Negligence has also been defined as a lack of due care or failure to do what a reasonable person would do under the circumstances. Norgaard v. Commissioner, 939 F.2d 874, 880 (9th Cir. 1991), affg. in part and revg. in part on other grounds T.C. Memo. 1989-390; Allen v. Commissioner, 925 F.2d 348, 353 (9th Cir. 1991), affg. 92 T.C. 1 (1989). "Disregard" includes any careless, reckless, or intentional disregard of rules or regulations. Sec. 6662(c); sec. 1.6662-3(b)(2), Income Tax Regs. With respect to individuals, an understatement of tax is substantial if it exceeds the greater of 10 percent of the tax required to be

shown in the return or $5,000 ($10,000 for corporations). Sec. 6662(d)(1)(A) and (B).

The accuracy-related penalty does not apply with respect to any portion of the underpayment if it is shown that there was reasonable cause for such portion and that the taxpayer acted in good faith. Sec. 6664(c)(1). The determination of whether a taxpayer acted with reasonable cause and in good faith depends upon the pertinent facts and circumstances, including the taxpayer's efforts to assess his or her proper tax liability, the knowledge and experience of the taxpayer, and reliance on the advice of a professional, such as an accountant. Sec. 1.6664-4(b)(1), Income Tax Regs.

Petitioners contend that the accuracy-related penalties are inappropriate in these cases because they relied on certified public accountants to prepare their Federal income tax returns accurately.[9] Such reliance, petitioners claim, is evidence that they acted with reasonable cause and in good faith. Respondent disagrees.

Generally, the duty of filing accurate returns cannot be avoided by placing the responsibility on a tax return preparer. Metra Chem Corp. v. Commissioner, 88 T.C. 654, 662 (1987). While

---

[9] Petitioners' 1989 tax returns were prepared by B.D.O. Seidman. Petitioners' 1990-1992 tax returns were prepared by Arthur Andersen & Co.

hiring an attorney or accountant does not insulate the taxpayer from negligence penalties, good faith reliance on professional advice concerning tax laws is a defense. United States v. Boyle, 469 U.S. 241 (1985); Betson v. Commissioner, 802 F.2d 365, 372 (9th Cir. 1986), affg. in part and revg. in part T.C. Memo. 1984-264. Reliance on a qualified adviser may demonstrate reasonable cause and good faith if the evidence shows that the taxpayer contacted a competent tax adviser and provided the adviser with all necessary and relevant information. Collins v. Commissioner, 857 F.2d 1383, 1386 (9th Cir. 1988), affg. Dister v. Commissioner, T.C. Memo. 1987-217; Jackson v. Commissioner, 86 T.C. 492, 539-540 (1986), affd. 864 F.2d 1521 (10th Cir. 1989). In order to prove such reliance, the taxpayer must establish that the return preparer was supplied with all necessary information, and the incorrect return was the result of the preparer's mistakes. Weis v. Commissioner, 94 T.C. 473, 487 (1990).

Respondent contends that all of the deficiencies were due to negligence, disregard of the rules or regulations, or a substantial understatement of income tax. Petitioner and EIC provided evidence of discussions that were held with their accountants regarding the proper accounting method to be used by them. With regard to the remaining items, such as the reasonable compensation, constructive dividends, and numerous concessions by petitioners, the record is silent as to what information peti-

tioner may have provided to his accountants, or what advice the accountants may have given petitioner. Accordingly, petitioner and EIC have failed to establish that they relied on any advice with respect to the remaining items. Where no reliable evidence exists in the record suggesting the nature of any advice given by a preparer, we may conclude that the taxpayers have failed to carry their burden in proving good faith reliance on that preparer. See Howard v. Commissioner, 931 F.2d 578, 582 (9th Cir. 1991), affg. T.C. Memo. 1988-531; Skeen v. Commissioner, 864 F.2d 93, 96 (9th Cir. 1989), affg. Patin v. Commissioner, 88 T.C. 1086 (1987). Consequently, we sustain respondent's imposition of the accuracy-related penalties on the portion of the underpayment attributable to these items for each of the years at issue.

Petitioner presented evidence of discussions that were held concerning the election of the installment method. Petitioner's accountant from Arthur Andersen & Co. testified about his reasons for selecting the installment method. He indicated that petitioner was forthcoming with all necessary information. On the basis of this information, petitioner's accountant advised petitioner to report income from land sales on the installment method. Petitioner is not a tax expert, and he relied on his accountants for this type of advice. Selecting an accounting method is a sufficiently technical issue, and reliance on the advice of an expert is reasonable under these circumstances. See

United States v. Boyle, supra at 251 ("Most taxpayers are not competent to discern error in the substantive advice of an accountant or attorney").  Accordingly, we do not sustain respondent's imposition of the accuracy-related penalties on the portions of the deficiencies relating to the change in accounting method.

To reflect the foregoing,

Decisions will be entered

under Rule 155.