T.C. Memo. 2001-190

UNITED STATES TAX COURT

EDWARD C. TIETIG, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 5884-98.                    Filed July 25, 2001.

Edward C. Tietig, pro se.

<u>Michael D. Zima</u>, for respondent.

MEMORANDUM OPINION

RUWE, <u>Judge</u>:  Respondent determined deficiencies in petitioner's Federal income taxes, accuracy-related penalties, and additions to tax as follows:

| Year | Deficiency | Penalty Sec. 6662(c) | Addition to Tax Sec. 6651(a)(1) |
|---|---|---|---|
| 1990 | $45,519 | $9,104 | $11,380 |
| 1991 | 42,441 | 8,488 | -0- |
| 1992 | 15,111 | 3,022 | -0- |
| 1993 | 6,848 | 1,370 | 1,027 |

After concessions,[1] the issues for decision are: (1) Whether petitioner is entitled to a $32,241 deduction for amounts purportedly paid to Mark Tietig for use of his securities as loan collateral in 1993; (2) whether Farm & Grove Realty, Co. (Farm & Grove) earned income of $215,922 on the sale of 53 lots in 1990; (3) whether petitioner had unreported capital gains of $57,531.25 in 1991; (4) whether petitioner is allowed a $179,937 net operating loss carryforward deduction in 1993; (5) whether petitioner is entitled to deduct $19,995 as a casualty loss in 1993; (6) whether petitioner is liable for the self-employment tax under section 1401[2] for 1990, 1991, and 1993; (7) whether petitioner is entitled to correcting entries relating to flow-through income reported from a partnership in 1990 and a flow-through loss reported from the same partnership in 1991; and (8) whether petitioner is liable for the accuracy-related penalty pursuant to section 6662(a) for the years 1990, 1991, 1992, and 1993.

For purposes of order and clarity, after a brief general background, each of the issues submitted for our consideration is set forth below with separate background and discussion.

---

[1]See appendixes A and B.

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

## General Background

Some of the facts have been stipulated and are so found. The stipulations of fact, the supplemental stipulations of fact, and the stipulation of settled issues are incorporated by this reference. Petitioner resided in Florida at the time he filed his petition.

Petitioner earned a bachelor's degree in marketing from the University of Cincinnati in 1951 and a juris doctor degree from the University of Michigan in 1956.

Petitioner was the sole stockholder and director of Eureka Field Nursery, Inc. (Eureka Field Nursery), Tropstock, Inc. (Tropstock), and Kiddies 50 Corp. Each corporation was involved in the sale and care of plants.

Petitioner was also the sole shareholder of Farm & Grove, holding 100 percent of its stock, and was entitled to 100 percent of the profits or losses of Farm & Grove during the years 1989 through 1993. Farm & Grove, an S corporation, was organized in 1978 to sell real estate.

In March of 1985, petitioner formed a partnership referred to as the Kiddies-CKE 38 Joint Venture.[3] Petitioner and his three minor children (Brian, Erik, and Kris Tietig) were all

---

[3]The association was labeled a joint venture on its Form 1065, U.S. Partnership Return of Income. For Federal income tax purposes, joint ventures are partnerships. Sec. 7701(a)(2). Thus, throughout this opinion we refer to it as a partnership.

partners in the partnership. The partnership was formed to acquire 38 lots for immediate sale.

On December 30, 1990, the Kiddies-CKE 38 Joint Venture acquired equitable title to 53 additional lots and changed its name to the Kiddies 91 Joint Venture[4] (Kiddies 38/91 partnership).[5]

In February of 1989, petitioner formed the Edward Tietig/ Mark Tietig 100 Lot Joint Venture (100-lot partnership).[6] The partnership's principal business activity was land resales.

## I. Issue 1. Payments for Use of Collateral

### A. Background

In 1982, petitioner had a series of loans that were coming due that were cross-collateralized by various properties. Petitioner needed to either pay off or refinance the loans but found that he could do neither. Petitioner did not have sufficient liquid funds to pay off the loans, and no institution would lend him the money. As a result, petitioner sought the

---

[4]The name changed because of the increased number of lots held by the joint venture (38 + 53 = 91).

[5]The association was labeled a joint venture on its Form 1065. For Federal income tax purposes, joint ventures are partnerships. Sec. 7701(a)(2). Thus, throughout this opinion we refer to it as a partnership.

[6]The association was labeled a joint venture on its Form 1065. For Federal income tax purposes, joint ventures are partnerships. Sec. 7701(a)(2). Thus, throughout this opinion we refer to it as a partnership.

help of his son Mark Tietig. At the time, Mark Tietig had cash reserves stemming from a settlement he had received from the Chris Craft Corp. on account of a boating accident.

Petitioner secured a loan from Westfield Financial Corp. (Westfield Financial) in July 1983. Westfield Financial agreed to modify an existing $550,000 loan to City National Bank of Miami as trustee (trust loan) and to lend petitioner $2 million (Tietig loan). The trust loan was guaranteed by petitioner, Mark Tietig, Emerald Lake of Delray, Inc., Emerald Lake Development & Construction Co., Farm & Grove, TropStock, Kiddies 50 Corp., and Eureka Field Nursery. The loans were both secured, in part, by real property owned by petitioner in Kissimmee, Florida (Kissimmee property), and by land in Lakeland, Florida. Both loans were also secured, in part, by securities worth approximately $800,000 pledged by Mark Tietig in 1983.[7]

Petitioner signed a promissory note agreeing to pay his son $800,000, plus interest at "the highest legal rate under the laws of Florida." The unpaid principal balance and the interest were due and payable on the earlier of July 20, 1985, or the date that Westfield Financial exercised its rights to realize upon the bonds pledged by Mark Tietig.

---

[7]The securities consisted of 600 units in E.F. Hutton and Co., Inc., Tax-Exempt Trust National Series #76 and 245 units in E.F. Hutton and Co., Inc., Tax-Exempt Trust National Series #77.

The promissory note would be deemed null and void if the bonds were released to Mark Tietig, and he was released from all liability without incurring any loss.  Pledging the bonds as collateral for the loan to petitioner was consideration for executing the promissory note.  Petitioner gave Mark Tietig a "surety loan or a surety note and mortgage" secured by real property owned by petitioner in five Florida counties.  All dividends and interest paid on account of the pledged securities were to be paid to Mark Tietig.

On September 19, 1983, Mark Tietig paid $200,000 to Eureka Field Nursery for an interest in 8,000 trees ($25 per tree). Additionally, Mark Tietig was required to pay $56,000 per year ($7 per tree) for maintenance of the trees, pursuant to a joint venture agreement between Mark Tietig and Eureka Field Nursery. Out of the sales of any trees, Mark Tietig was to receive his cost[8] plus 6 percent, plus 50 percent of any profit after a $10 commission was paid to the nursery.

In August 1985, petitioner secured a loan from Caribank of $3,430,000.  From the Caribank loan proceeds, $1,900,000 was given to Westfield Financial, reducing the amount of that loan balance to approximately $500,000 and removing the Kissimmee and Lakeland properties from the Westfield Financial mortgage.  The

---

[8]The initial fee plus a prorated amount to reimburse him for maintenance of the trees.

remainder of the loan from Caribank was to fund the construction of 27 condominium units on the Kissimmee property.

As security for the Caribank loan, a portion of the securities previously pledged by Mark Tietig for the Westfield Financial loan was allocated to part of the collateral for the Caribank loan.

In March 1988,[9] petitioner, Eureka Field Nursery, Farm & Grove, and Mark Tietig entered into a "First Amendment and Supplement to Joint Venture Agreement" (amended joint venture agreement). The agreement amended the terms of the joint venture created in the September 19, 1983, agreement between Mark Tietig and Eureka Field Nursery, and stated that Eureka Field Nursery owed Mark Tietig $68,786.41 ($56,000 plus $12,786.41 interest), which represented his original investment in the joint venture. The agreement also provided that petitioner owed Mark Tietig $230,000 for the "past and future use" of his securities. In total, Mark Tietig was owed $298,786.41 under the agreement.[10] Mark Tietig, however, was not limited to this amount in the event that the remaining pledged securities were taken by Westfield Financial. Paragraph 3 of the amended agreement stated that the

---

[9]The agreement states that it was made on Sept. 30, 1987; however, in the upper left-hand corner of the agreement the date Mar. 14, 1988, appears. Whether the agreement was in effect in 1987 or 1988 is irrelevant for the purpose of our analysis.

[10]Consisting of: $230,000 + $68,786.41 = $298,786.41.

$298,786.41 due to Mark Tietig was not to draw interest and was to be Mark Tietig's contribution to the joint venture.

Mark Tietig's investment return was to come from joint venture sales (various lots and trees) and from any proceeds received from the State of Florida on account of the canker settlement.[11]

Caribank eventually released to Mark Tietig its portion of the securities pledged by him, the value being approximately $500,000. The remainder of the collateral was taken by Westfield Financial in 1989, with Mark Tietig losing $300,000 worth of securities.

As of June 6, 1991, the balance owed Mark Tietig by petitioner and the entities that he controlled was listed as $445,000. Petitioner, Mark Tietig, and various other entities in which petitioner owned an interest entered into an agreement called the "Settlement Agreement and Amendment to Blanket Surety Mortgage" (settlement agreement) for the stated purpose of restating the parties' "mutual obligations". The agreement was dated August 5, 1992.

Under the terms of the settlement agreement, petitioner and the various entities that he controlled owed Mark Tietig

---

[11]According to the amended joint venture agreement, a portion of the trees which were subject to the original joint venture agreement was destroyed, with little or no compensation, by the State of Florida pursuant to the citrus canker eradication program.

$371,600. Interest was provided for at 10 percent. Additionally, petitioner agreed to make principal only payments of $5,000 to Mark Tietig each month beginning November 1, 1992.

There was a dispute between Mark Tietig and a law firm over fees incurred in petitioner's bankruptcy case.[12] The settlement agreement provided that if it was determined that Mark Tietig owed any additional attorney's fees, then petitioner would pay them to Mark Tietig, and this amount would be added to the amount petitioner owed Mark Tietig under the original 1983 promissory note and agreement and secured by the same collateral.

B. Discussion

Deductions are a matter of legislative grace, and the burden of showing the right to deductions is on the taxpayer. Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992). Petitioner argues that he is entitled to a $32,241 deduction in 1993 for payments that he allegedly made to his son Mark Tietig. The deduction was not claimed on petitioner's Federal income tax return for that year or disallowed by respondent in his notice of deficiency; rather, the issue was raised for the first time by petitioner in his petition to the Tax Court. Petitioner did not explain in his petition or on brief how he arrived at $32,241 as a deduction or why it is deductible.

_____

[12]Petitioner filed for bankruptcy on Sept. 22, 1988.

Petitioner does indicate that his claim is somehow based upon transactions in which Mark Tietig pledged certain securities as collateral in order to help petitioner secure loans from banks. In support of petitioner's argument, he submitted a handwritten accounting sheet entitled "Mark E. Tietig Accounting".[13] On the accounting sheet, the "beginning balance" before June 6, 1991, is listed as $445,000. Petitioner did not explain how this figure was derived.

A check number appears next to most, but not all, of the reported payments. There is nothing on the accounting sheet to indicate what entity made the payments, and petitioner did not provide copies of the checks or bank statements.

If the payments were, in fact, made, then some or all of the payments could have been made by corporations controlled by petitioner, rather than petitioner himself. For instance, the very first payment reflected on the accounting sheet is a $54,230 payment made by Eureka Field Nursery on June 6, 1991. That check was written on and drawn from Eureka Field Nursery's bank account. Mark Tietig testified that Eureka Field Nursery owed him approximately $256,000 and that he had fully collected that debt. Thus, additional payments reflected on the accounting sheet, if made, may have come from and on behalf of a debt owed

---

[13]See appendix C. The author of the accounting sheet and the date of its creation are unknown.

by Eureka Field Nursery. If so, these payments may already have been deducted as expenses on Eureka Field Nursery's corporate income tax returns.

Indeed, petitioner could not recall whether the 1993 payments reflected on the accounting sheet were made from a personal bank account or an account from a corporation controlled by petitioner. When petitioner was pressed on this point, he indicated that Judy Fox could provide additional details regarding the payments. Ms. Fox testified that she has been the office manager for Farm & Grove, the Tietig 4 Land Trust, Kiddies 38 partnership, Edward C. Tietig, PA, Villasol Realty, and Emerald Lake Utilities since 1990 and that she is the primary custodian of the canceled checks and bank statements. Nevertheless, petitioner did not ask Ms. Fox during her testimony to establish the source of the checks. The inference we draw is that the testimony would have been unfavorable to petitioner. See Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947).

Moreover, petitioner testified that he had bank statements and checks reflecting the payments in his business office at the time of the trial.[14] A party's failure to introduce evidence within his possession and which, if true, would be favorable to him gives rise to the presumption that if produced it would be

_____

[14]Petitioner testified that all payments were made by check.

unfavorable.  Recklitis v. Commissioner, 91 T.C. 874, 890 (1988); Pollack v. Commissioner, 47 T.C. 92, 108 (1966), affd. 392 F.2d 409 (5th Cir. 1968); Wichita Terminal Elevator Co. v. Commissioner, supra at 1165.

Assuming arguendo that the payments were made, and from petitioner's personal account, it is not clear that the payments were not moneys paid to Mark Tietig's attorneys by petitioner as the result of the settlement agreement executed in 1992. Payments made for this purpose have not been shown to be deductible.  We hold that petitioner is not entitled to the $32,241 deduction.

## II.  Issue 2.  Farm & Grove's Sale of 53 Lots in 1990

### A.  Background

Farm & Grove reported $249,723 in gross income on its 1990 Form 1120S, U.S. Income Tax Return for an S Corporation.

In a series of transactions between 1981 and the end of 1990, Farm & Grove acquired a large inventory of unimproved land lots in Brevard County, Florida.  Included in the series was Farm & Grove's 1987 acquisition of a fee simple interest in 539 lots in the Cape Kennedy Estates real estate development from the Atlantic Ridge Corp. for a purchase price of $317,272.

On December 30, 1990, Farm & Grove transferred equitable title of 53 of the Brevard County lots to the Kiddies 38

partnership.[15]   The transfer was accomplished with the execution

of the First Amendment to Kiddies 38 Agreement (sales agreement).

Petitioner, Farm & Grove, and petitioner as guardian of his minor

children (Brian, Erik, and Kris Tietig) were parties to the sales

agreement.[16]   Petitioner and his minor children were all partners

in the Kiddies 38 partnership, which was now called the Kiddies

91 partnership.

The sales agreement provided, in part, as follows:

3.   The consideration to be paid by the Joint Venture
to * * * [Edward C.] Tietig and Farm & Grove is as
follows:

a.   The payment by the Joint Venture of the
note and mortgage attached hereto * * * in the
total amount of $174,900 which represents
$3,300.00 per lot release price of these lots from
the lien of the County Bank mortgage.

b.   A further sum of $72,822.00 cash
representing additional consideration of $1,374.00
per lot.  Said cash shall be paid by the sale
and/or hypothecation of existing mortgages
receivable * * *.  When each of these notes and
mortgages shall be hypothecated and upon what
terms shall be at the discretion of Tietig; but,
provided however, that a net cash flow of no less
than $1,250.00 per month shall remain * * *

---

[15]Before this transaction, the partnership was referred to
as the Kiddies-CKE 38 Joint Venture.  Afterwards, its new name
was Kiddies 91 Joint Venture.  The name changed because of the
increased number of lots held by the joint venture (38 + 53 =
91).

[16]Petitioner signed the agreement individually, as president
of Farm & Grove, and as natural father and duly appointed
guardian of his three minor children (Brian, Erik, and Kris
Tietig).

The attached unexecuted Mortgage Deed listed Farm & Grove as the mortgagor (debtor) and petitioner as mortgagee (lender). The Mortgage Deed, which was not executed, also provided as follows:

> Random releases for each parcel encumbered herein shall be given at any time upon payment of $3,300.00 principal [p]lus accrued interest upon such amount. All regular paymenbts [sic] and prepayments of principal shall be credited towards such releases.

The note provided the following terms:

> FOR VALUE RECEIVED the undersigned promises to pay to the order of Edward C. Tietig the principal sum of One hundred seventy-four thousand nine hundred Dollars ($174,900) together with interest thereon from March 1, 1991 at the rate of 8.9% per cent, per ANNUM until maturity, said interest being payable monthly on the 1st day of March, 1991 and payment both principal and interest being payable in lawful money of the United States or its equivalent to Farm & Grove Realty. * * *

> Payments of principal and interest of $1,393.95 on the first (1st) day of April, 1991, and on the first (1st) day of each month thereafter until the first (1st) day of March 2021, when the entire remaining balance will become due and payable.

> This Note may be prepaid in whole or in part, at any time, without penalty.

As a result of the transaction, Farm & Grove held only the legal title to the lots, as trustee for the Kiddies 38/91 partnership. Farm & Grove did not report any gain from the sale of the equitable interest in the 53 lots to the partnership on its 1990 Form 1120S.

The Kiddies 38/91 partnership appears to have been solvent in 1990 and 1991. On Schedule L, Balance Sheets, of its 1991 Form 1065, U.S. Partnership Return of Income, the partnership

reported assets in excess of liabilities of $442,480. The partnership also reported ordinary income of $48,072.84 and $91,092 on its 1990 and 1991 Forms 1065, respectively.

B.  Discussion

Respondent asserts that petitioner realized $216,524.61[17] of gain on the transfer of 53 lots from Farm & Grove to the Kiddies 38/91 partnership in 1990.[18]  Petitioner argues that either gain from the transfer should be recognized in a year subsequent to 1990 or, in the alternative, no gain at all should be recognized. We address petitioner's arguments in turn.

---

[17]Gain on the transfer was calculated by subtracting Farm & Grove's basis in the 53 lots from the purchase price.  Farm & Grove paid $317,272 to acquire the 539-lot parcel which included the 53 lots whose equitable interest was transferred to the Kiddies-CKE 38 partnership.  Respondent assumed that the lots were equal in value, and petitioner has not asserted otherwise. Thus, Farm & Grove's basis in the 53 lots whose equitable interest was transferred was $31,197.39 or $588.63 per lot.

Respondent calculated the purchase price by adding the amount Farm & Grove was to eventually receive upon the sale of each lot to third parties ($1,374 x 53 lots = $72,822) to the amount required for the release of the County Bank mortgage lien ($174,900).  According to respondent, the total amount received by Farm & Grove was $247,722 ($72,822 + $174,900 = $247,722). Therefore, respondent calculated petitioner's gain on the transfer to be $216,524.61 ($247,722 - $31,197.39 = $216,524.61)

[18]The notice of deficiency determined gain of $215,922. According to respondent, the difference between the $216,524.61 gain asserted on brief and the $215,922 used in the notice of deficiency is attributable to rounding.  Originally, respondent rounded the price per lot paid by Farm & Grove for the acquisition of the lots up from $588.63 to $600 (53 x $600 = $31,800) and ($247,722 - $31,800 = $215,922).

### 1. <u>Timing</u>

Petitioner offers two arguments why gain from the sale should not be recognized in 1990. First, petitioner asserts that the Kiddies 38/91 partnership's $174,900 payment to Farm & Grove for the 53 lots was contingent upon County Bank's reducing petitioner's debt to the bank by $174,900 or $3,300 per lot. According to petitioner, when County Bank refused to transfer the debt obligation to the partnership, payment was treated as a contingent sale from resales starting in 1991. We find no such language in the sales agreement.

Consideration for the transfer consisted of $174,900 ($3,300 per lot) through the assumption of debt,[19] plus $1,374 per lot to be paid upon the sale and/or hypothecation of the existing mortgage on those lots. Nothing in the agreement indicates that the transfer was contingent upon County Bank's reducing petitioner's debt by $174,900. Rather, the agreement explicitly provides that consideration for the transaction was to be paid by the partnership to petitioner and Farm & Grove. The attached Mortgage Deed and note, while not executed, provides further evidence that the agreement was not contingent upon County Bank's reducing petitioner's debt by $174,900. Farm & Grove and petitioner were named as parties on the Mortgage Deed and on the

---

[19]This amount is the same amount that was required to release a lot from the County Bank mortgage lien.

note. The Mortgage Deed provided for random releases upon the payment of $3,300 principal plus accrued interest. Absent from the Mortgage Deed and the note is any mention of County Bank. Thus, we conclude that when the transaction was structured and executed, it was not contingent upon County Bank's reducing petitioner's debt by $174,900.

The agreement was dated December 31, 1990. Therefore, the sale was made in 1990, and Farm & Grove must recognize income from the sale in 1990.[20]

Petitioner's second timing argument is that the sale should be recognized under the installment method provided under section 453. For Federal income tax purposes, gain from qualifying installment sales of property can be reported under the installment method subject to certain exceptions. Sec. 453(a)(1). Dealer dispositions are excepted from the definition of "installment sale" by section 453(b)(2)(A). A dealer disposition includes any disposition of real property which is held by the taxpayer for sale to customers in the ordinary course of the taxpayer's business. Sec. 453(l)(1)(B).

Petitioner does not dispute that Farm & Grove was engaged in the trade or business of selling real estate. However,

---

[20]Farm & Grove did not report any gain from the sale of the equitable interest in the 53 lots to the partnership on its 1990 Form 1120S, U.S. Income Tax Return for an S Corporation.

petitioner argues that Farm & Grove satisfies the exception for sales of residential lots to individuals.

The sale of a residential lot to an individual in the ordinary course of a taxpayer's business is not considered a dealer disposition if neither the seller nor any person related to the seller can make any improvements on the lot. Sec. 453(l)(2)(B)(ii)(II). In the instant case, the transfer of lots was not made to an individual. The property transfer was to a partnership, the Kiddies 38/91 partnership. The common, ordinary, and plain meaning of section 453(l)(2)(B)(ii)(II) requires that the transfer be made to an individual. The language seems to be so unambiguous as to give no alternative but to apply it precisely as written. We find nothing that would support an interpretation of section 453(l)(2)(B)(ii)(II) that differs from the words of the statute, and petitioner has not provided us with any reasoning to support his argument.

Petitioner also has not provided sufficient evidence that the 53 lots transferred were residential lots. For purposes of section 453(l)(2)(B)(ii)(II), a residential lot is a parcel of unimproved land upon which the purchaser intends to construct (or intends to contract to have another person construct) a dwelling unit for use as a residence by the purchaser. Wang v. Commissioner, T.C. Memo. 1998-127.

In petitioner's proposed findings of fact relating to this issue, he did not assert any facts or point to any exhibits or testimony that would indicate that the lots in question were zoned so that a buyer would be permitted to construct a house on the property if the buyer desired or that the lots were marketed to potential purchasers as residential lots suitable for building dwelling units on the land as opposed to a speculative investment. Id. Petitioner has not met his burden of showing that he satisfied the residential real estate exception for dealer dispositions.

Since section 453 is substantively unavailable to Farm & Grove, the established realization and recognition principles under section 1001 are controlling. Under section 1001(b), the amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received.

### 2. Fair Market Value of Cash Equivalent

Petitioner argues, in the alternative, that the gain to Farm & Grove is not the face value of the note but its market value. Petitioner asserts that the note had no value, and therefore, no gain accrued to Farm & Grove.

To establish that the note had a fair market value of zero, petitioner testified that the note had no value because County Bank would not accept it. Petitioner further testified that

finance companies would not take the note and that the lots were unmarketable because $3,300 had to be put up in order to obtain good title to a lot.

By contending that the note had no fair market value upon receipt, petitioner assumes the burden of establishing that contention. See Rule 142(a). We do not consider the fact that petitioner failed to convince County Bank to accept the note as having any weight. There may have been other reasons aside from the marketability of the note which prevented County Bank from accepting it. Petitioner did not offer into evidence anything from County Bank indicating its refusal to accept the note and why. No expert witnesses testified that there was no market for the note.

Petitioner does assert on brief that he "testified as to his past experience in selling or hypothecating notes of this type". When we review the testimony cited by petitioner, we note that he testified only with regard to his experience with this note, not any past experiences with other similar notes. With regard to his experience with the note in question, he did not provide any corroborating evidence to support his testimony (e.g., testimony from a representative of County Bank indicating that County Bank refused to accept the note because it had no value).

In our opinion, the evidence does not sustain petitioner's contention. Petitioner has not established any lesser value or

shown by a preponderance of the evidence that the note had no fair market value; therefore, we must affirm respondent's determination.

Moreover, the solvency of the maker of a note is of prime importance in determining whether it is worth its face value.[21] Pack v. Commissioner, T.C. Memo. 1980-65. In the instant case, the partnership was solvent. On Schedule L of its 1991 Form 1065, the partnership reported "partnership equity accounts" in excess of $400,000 for 1990 and 1991. Additionally, petitioner testified that his three minor children, who were partners in the partnership, had "considerable funds of their own." Petitioner was a partner in the partnership. He signed the First Amendment to Kiddies 38 Agreement individually, as president of Farm & Grove, and as guardian of his three minor children, stating that the consideration for the lots would be paid by the partnership to petitioner personally and to Farm & Grove. Thus, we have no reason to believe that the partnership or its partners would not make good on the payments contemplated by the sales agreement and the promissory note.

---

[21]Respondent argues on brief that he determined that the fair market value of the contractual promise and the note was the face amount.

III.  Issue 3.  1991 Capital Gains

A.  Background

A two-story structure was constructed in Miami, Florida (Miami property), during 1984.  Eureka Field Nursery, Tropstock, and Kiddies 50 Corp. (corporations) were to share the construction costs of the Miami property, which combined office and residential space.

The corporations resolved that the expenses of building the structure would be allocated as follows:

| Corporation | Percentage of Expenses |
|---|---|
| Eureka Field Nursery, Inc. | 47.5 |
| Tropstock, Inc. | 47.5 |
| Kiddies 50 Corp. | 5.0 |

Additionally, the corporations resolved that the three corporations could demand contributions from Farm & Grove or any other entity which used the facilities.

In order to facilitate the construction of the structure, petitioner obligated himself as mortgagor to AmeriFirst Mortgage Co. as mortgagee, in the amount of $214,000.

On Eureka Field Nursery's 1985 Form 1120S, it claimed a depreciation allowance of $16,555.04 on the property.  The accompanying depreciation schedule reports a cost basis in the structure of $446,985.19 and an 18-year recovery period.  Eureka Field Nursery used the straight-line method of depreciation in 1985 in calculating its allowable depreciation deduction.

On Schedule L of Eureka Field Nursery's 1985 Form 1120S, the company reported "Buildings and other depreciable assets" of $508,207.32 at the end of the tax year.  On Schedule L of Eureka Field Nursery's 1986 Form 1120S, the company reported "Buildings and other depreciable assets" of $61,597.13 before depreciation of $42,592.07 at the end of the tax year.

A judgment of foreclosure was ordered on December 2, 1991, with respect to the Miami property.  Resolution Trust Corporation (RTC) was the plaintiff.  The Circuit Court for Dade County, Florida, determined that RTC was due $206,044.77 in principal under the note and mortgage sued upon, interest on the date of judgment of $47,944.02, and unpaid real estate taxes from the years 1989, 1990, and 1991 of $14,386.85, plus other costs of the suit.

B.  Discussion

Petitioner did not report any capital gains or losses on his 1991 Federal income tax return.  Respondent argues that petitioner had unreported capital gains of $57,531.25 in 1991. This figure results from respondent's netting long-term capital gains of $90,534.25 with short-term capital losses of $33,003. We address the long-term gains and short-term losses in turn.

1.  Long-Term Capital Gains

Respondent computed long-term capital gains of $90,534.25 by netting a long-term capital gain of $90,720.25 with a long-term

capital loss of $186. The parties dispute the amount of gain that petitioner should have recognized when the Miami property was foreclosed and the amount of loss that petitioner should have recognized when Eureka Field Nursery ceased doing business. We address the gain on the Miami property first.

### a. Miami Property

Respondent argues that petitioner realized a $90,720.25 long-term capital gain when the Miami property was foreclosed in 1991.

Petitioner does not dispute that relinquishment of the Miami property by means of a foreclosure sale is treated as a sale or exchange. Chilingirian v. Commissioner, 918 F.2d 1251 (6th Cir. 1990), affg. T.C. Memo. 1986-463. Petitioner does dispute: (1) The percentage of gain or loss attributed to business versus personal use; (2) petitioner's basis in the structure; and (3) whether real estate taxes and mortgage interest forgiven should be part of the amount realized. We turn to petitioner's arguments in turn.

### i. Business v. Personal Use

In the notice of deficiency, respondent determined that the structure on the Miami property was used 59 percent in a trade or business. Petitioner argues that the entire structure was used in a trade or business despite the fact that he lived there.

In determining whether there is gain or loss on the foreclosure of petitioner's property in 1991, an allocation must be made for tax purposes between the portion of the structure's use devoted to personal use and the portion devoted to petitioner's business.  See Snyder v. Commissioner, T.C. Memo. 1975-221.

According to petitioner, the entire structure should be treated as property used in a trade or business despite the fact that he lived there.  In support of his argument, petitioner cites four Tax Court cases.[22]  In each cited case, the taxpayer was seeking an exclusion from gross income under section 61 for either lodging or meals provided by his employer pursuant to section 119.

Under section 119(a)(2), the value of lodging furnished to an employee is excluded from the employee's gross income if "the employee is required to accept such lodging on the business premises of his employer as a condition of his employment." Here, however, the fair rental value of the lodging provided to petitioner has not been included in his income by respondent. Rather, respondent determined that petitioner realized a capital gain when the Miami property was foreclosed.  Thus, section 119 as an exception to section 61 does not apply in the instant case.

---

[22]Giesinger v. Commissioner, 66 T.C. 6 (1976); Lindeman v. Commissioner, 60 T.C. 609 (1973); Olkjer v. Commissioner, 32 T.C. 464 (1959); and Stone v. Commissioner, 32 T.C. 1021 (1959).

Petitioner has not met his burden of showing that respondent's business use determination was incorrect.

## ii. Basis

Petitioner asserts that his basis in the Miami property (excluding land and fill costs) was $491,182, of which $446,000 was depreciable.[23]  In the notice of deficiency, respondent determined that petitioner's cost basis in the structure was $214,000, which represented the amount of the mortgage and note executed by petitioner in favor of Amerifirst Mortgage Co.[24]

---

[23]We note that a depreciation schedule for Eureka Field Nursery for the end of the fiscal year Dec. 31, 1985, reports a cost basis of $446,985.19 in the structure, not $446,000 as asserted on page 10 of his brief and not $445,182 as asserted on page 13 of his brief.

[24]The notice of deficiency also adjusted petitioner's cost basis in the Miami property for allowed or allowable depreciation on the basis of the business portion of the structure and using the straight-line method with a recovery period of 18 years.  In his petition, petitioner calculates depreciation deductions on the Miami property for the years 1988 through 1991 under the straight-line method with a recovery period of 18 years. Petitioner makes no reference in his trial memorandum to how allowable depreciation deductions for the Miami property are to be treated.

In petitioner's posttrial briefs, he calculates allowable depreciation for the period 1986 through 1991 for the first time using a 31.5-year recovery period but makes no argument as to why 31.5 years is the correct recovery period.

The petition filed in this case, as it relates to this issue, does not satisfy the requirements of Rule 34.  The petition did not provide any indication that petitioner intended to make the recovery period an issue, nor did it contain a clear and concise assignment of error on the part of the Commissioner. See Rule 34(a) and (b)(4).  Any issue not raised in the

(continued...)

A taxpayer is required to maintain records sufficient to show whether he or she is liable for Federal income taxes. Sec. 6001. Petitioner has not provided any invoices from contractors or canceled checks showing the billing or payment of any cost. No documentation other than the foreclosure has been presented with respect to petitioner's cost basis in the structure.

Petitioner testified that he lacked adequate records to substantiate his costs because his records were stolen in 1991. Petitioner did not try to reconstruct his records from other sources.[25] Instead, petitioner offered his own testimony, the testimony of his son, Mark Tietig, and a letter from an architect to substantiate his claimed cost basis in the Miami property.

Petitioner's testimony included his personal estimates of the actual cost to build the structure based on a price per square foot. Petitioner's estimates were derived by taking the basis figure reported on a depreciation schedule prepared for Eureka Field Nursery's 1985 Form 1120S and then backing into this figure by estimating the square footage cost of the structure.

_____

[24](...continued)
assignment of error shall be deemed to be conceded. Rule 34(b)(4). Therefore, no adjustment to the recovery period applied in the notice of deficiency is required.

[25]Petitioner testified that he could not locate the general contractor. However, he did not attempt to contact any of the subcontractors even though he knew them by name and, in some instances, had written checks payable to both the general contractor and the subcontractor.

Petitioner's testimony was not based on his actual recollection of the costs incurred; rather, it was calculated to corroborate the figure listed on the tax return.

Mark Tietig's testimony, like petitioner's, included personal estimates of the actual cost to build the structure based on a price per square foot. His testimony was not based on his actual recollection of the costs incurred, nor did he specify the cost of individual items[26] that were computed as part of the total cost of construction.

We find that the personal estimates provided by petitioner and Mark Tietig are neither persuasive nor conclusive evidence of petitioner's actual cost to build the structure.[27]

---

[26]He testified regarding the different prices per square foot for different sections of the structure (e.g., garage, first floor, second floor) but not for individual components such as concrete, framing, etc.

[27]Even if the estimated cost per square foot were close to what a person would pay to build this particular structure, it does not follow in this case that petitioner actually incurred those costs. Petitioner took great pride in his ability to build the structure at the "lowest price". Petitioner acknowledged that as a contractor, he saved money by doing some aspects of the construction, and much of the procurement of materials, himself.

Petitioner also provided a letter dated October 10, 1996, written by Architect Alan Lerner.[28] According to the letter, the cost of the structure was $400,000.[29]

Mr. Lerner's letter was not written near the time the Miami property was built; it was written approximately 12 years after the structure was completed. Furthermore, according to petitioner's own testimony, Mr. Lerner did not bill for the cost of construction materials or services, nor did he pay them. Moreover, Mr. Lerner's letter does not indicate that he consulted any of the contractors who did the work or that he referenced a written record or source documents to determine the structure's actual cost.

Petitioner has not established that respondent's determination that petitioner's cost basis in the structure was greater than $214,000 was in error.[30]

_____

[28]The parties included this letter as an exhibit in their stipulation of facts. The stipulation stated that respondent did not stipulate the truth of the letter's content.

[29]We note that the estimated cost provided by Mr. Lerner ($400,000) cannot be reconciled with petitioner's estimated cost of $446,000 as asserted on page 10 of his brief, or $445,182 as asserted on page 13 of his brief, or $446,985.19 as reported on a depreciation schedule attached to Eureka Field Nursery's 1985 income tax return.

[30]Consistent with respondent's determination, 59 percent or $126,260 of petitioner's $214,000 cost basis in the structure is allocated to business use, while the remaining 41 percent or $87,740 is allocated to personal use.

(continued...)

### iii. Past Due Taxes and Interest

In determining the amount realized by petitioner upon foreclosure of the Miami property, the notice of deficiency did not include past due taxes of $14,386.85 and interest of $47,944.02. This is a new matter upon which respondent has the burden of proof. Rule 142(a).

Petitioner asserts in his petition that the principal balance of $206,044.77 at the time of foreclosure represents the total consideration for purposes of determining gain or loss. However, petitioner appears to have abandoned this argument on brief. Indeed, petitioner in an exhibit contained in his reply brief under the heading "Calculation of Foreclosure Loss" treats the $47,944.02 of past due interest and the $14,386.85 in past due taxes as amounts realized. Petitioner does not argue, in either his opening or rely brief, that these items should not be included in the amount realized. We find that the amount

---

[30](...continued)
Respondent then adjusted petitioner's cost basis of $126,260 as follows:

| | |
|---|---|
| Cost basis | $126,260.00 |
| Depreciation already claimed (1985 Form 1120S) | (16,555.04) |
| Allowable depreciation not claimed between 1986 and 1991 | (42,084.00) |
| Petitioner' adjusted basis | 67,620.96 |

We note that respondent, in adjusting petitioner's basis by $16,555 for depreciation already claimed, rounded to the nearest dollar. We have added 4 cents to respondent's figure for consistency.

petitioner realized upon the disposition of the Miami property in foreclosure includes the accrued interest of $47,944.02 and real estate taxes of $14,386.85.[31]

We hold that petitioner realized $268,375.64[32] upon foreclosure of the Miami property, and as stated above, the amount realized is to be apportioned 59 percent business and 41 percent personal. Thus, petitioner's capital gain on the foreclosure of the Miami property in 1991 is $90,720.66.[33]

    b.    Long-Term Capital Loss

Respondent determined that petitioner incurred a long-term capital loss of $186 on his Eureka Field Nursery stock when the

---

[31]The notice of deficiency stated that if these costs were claimed as a deduction, then the amount realized would be increased by the same amount. Petitioner argues that he is entitled to an itemized deduction for the past due real estate taxes and mortgage interest. Respondent concedes petitioner's entitlement to these deductions but apportions the expenses as 59 percent business and 41 percent personal. Consistent with our earlier finding regarding apportioning business versus personal use of the structure, we find that petitioner is entitled to the deductions but on a prorated basis as determined by respondent.

[32]The $206,044.77 of principal, $47,944.02 of accrued interest to the date of judgment, and $14,386.85 of real estate taxes for a total of $268,375.64 ($206,044.77 + $47,944.02 + $14,386.85 = $268,375.64).

[33]Amount realized (see supra note 32)          $268,375.64
  Business use of property                      x          .59%
                                                 158,341.62
  Less adjusted basis (see supra note 30)        67,620.96
  Net gain                                       90,720.66

We note that a 41-cent difference exists between our calculation and respondent's ($90,720.66 - $90,720.25 = $0.41).

company ceased business in 1991.  Petitioner argues that the amount of the capital loss is $140,800.

The principal dispute between the parties turns on whether petitioner's basis[34] in Eureka Field Nursery stock was reduced by a reported $155,440.09 reduction in Eureka Field Nursery's accumulated adjustment account (the undistributed earnings on which tax has been paid by Eureka Field Nursery's shareholders) in 1986.[35]

Petitioner asserts that the 1986 reduction in the accumulated adjustment account was not a distribution; rather, it was an accounting entry to correct a prior error.  According to

---

[34]Respondent determined petitioner's adjusted stock basis in Eureka Field Nursery by using the figures reported on the company's Forms 1120S for the years 1983 through 1990, inclusive. Respondent made two variations from strict adherence to the income tax returns.  The first variation involves the treatment of the reported $155,440.09 reduction in Eureka Field Nursery's accumulated adjustment account in 1986 (discussed above).  The second variation involves a $43 adjustment to petitioner's stock basis in 1990, which petitioner has not disputed.  Thus, we consider the $43 adjustment conceded by petitioner.

[35]Respondent determined that petitioner's adjusted basis of $145,151 in his Eureka Field Nursery stock was reduced to zero as a result of the $155,440.09 distribution.  See sec. 1367(a)(2)(A).  As a result, petitioner realized no gross income from the distribution to the extent of $145,151, his basis in the Eureka Field Nursery stock.  See sec. 1368(b)(1).  Accordingly, respondent asserts that petitioner should realize the amount in excess of his adjusted basis in his Eureka Field Nursery stock, $10,289, as gain ($155,440.09 – $145,151 = $10,289.09).  See sec. 1368(b)(2).  Respondent concedes that his examiner erred by applying this excess against petitioner's shareholder loans with Eureka Field Nursery.  Instead, this figure constituted gain to petitioner.  See id.

petitioner, his outside accountant incorrectly assumed that Eureka Field Nursery owned the Miami property since it claimed depreciation on the structure in 1985. This assumption led the outside accountant to increase Eureka Field Nursery's assets by $491,182.26 on Schedule M of its 1985 Form 1120S. Petitioner states that he discovered this mistake in 1986 and then ordered the outside accountant to remove the item from the Schedule L balance sheet. This led, according to petitioner, to reductions in the accumulated adjustment account of $155,440.09 in 1986 and $31,543 in 1987 and an increase of $698 in 1988.

We have already found that petitioner has not established that his cost basis in the Miami property was $446,985.19. However, even if we were to accept petitioner's assertion that his cost basis in the structure was $446,985.19, it does not necessarily follow that the subsequent reductions in the accumulated adjustment account related to the Miami property. If the "other reductions" entry on Eureka Field Nursery's 1986 Form 1120S was an entry to remove the structure from the Schedule L balance sheet, then the entry would have been approximately $491,182.26, not $155,440.09.

Petitioner did not offer any evidence to substantiate his claim. Petitioner did not call the outside accountant as a witness. We can only presume that any testimony supplied by that

individual would not have been favorable.  See <u>Wichita Terminal Elevator Co. v. Commissioner</u>, 6 T.C. at 1165.

We sustain respondent's determination that petitioner's long-term capital loss on the Eureka Field Nursery Stock is $186 in 1991.

### 2.  Short-Term Capital Loss

Respondent determined that petitioner incurred a bad debt loss in 1991 of $22,714 due to unpaid shareholder loans by Eureka Field Nursery when it ceased operations in 1991.  On brief, respondent argues that petitioner's loss is $33,003.[36]

In his petition, petitioner asserted that respondent erred in determining the amount of nonbusiness bad debt in 1991, but he makes no arguments in his brief regarding this issue.  Petitioner asserts in his reply brief that respondent concedes the amount stated, $22,714, but that the true amount in dispute is $60,368[37] as set forth in "Petitioner's Recap, Exhibit 1 hereto."  However,

---

[36]The amount of the loss is based on a $55,567 outstanding shareholder loan reported on Schedule L of Eureka's 1990 income tax return with two modifications:  An increase of $4,800 in 1990 and a decrease of $27,365 in 1991.

Petitioner does not dispute the $4,800 increase in shareholder loans to $60,367 in 1990, and the $27,365 decrease in shareholder loans in 1991 was stipulated by the parties.  Thus, the total loss is $33,003 ($55,567 + $4,800 = $60,367 - $27,365 = $33,002.  We note a $1 difference.).

[37]Apparently, petitioner neglected to reduce the total loan amount due of $60,367 by the stipulated loan repayments totaling $27,365.  See <u>supra</u> note 36.

petitioner's recap states as follows:  "Short Term Capital Loss - Worthlessness of Shareholders Loans - EFN ($33,003.00)". Petitioner makes no arguments in his reply brief regarding this issue.  We conclude that petitioner's bad debt loss in 1991 is $33,003.  See Money v. Commissioner, 89 T.C. 46, 48 (1987).

IV.  Issue 4.  1993 Net Operating Loss

A.  Background

On Schedule E, Supplemental Income and Loss, of petitioner's original 1990 Federal income tax return, he reported nonpassive losses from Schedule K-1, Partner's Share of Income, Credits, Deductions, Etc., of $130,722 and passive and nonpassive income from Schedule K-1 of $52,633.  This resulted in a loss on Schedule E of $78,089.  On Schedule 1, petitioner reported that $78,386 of the $130,722 nonpassive losses was from Farm & Grove. On page 1 of petitioner's 1990 Federal income tax return, he reported a negative adjusted gross income of $77,183, which consisted of the $78,089 loss from Schedule E, taxable interest income of $844.05, and dividend income of $61.08.

On petitioner's amended 1990 return, he increased the reported loss from Farm & Grove by $4,506 to $82,892 and reported additional income of $32,172 from the 100-lot partnership.

On Schedule E of petitioner's 1992 Federal income tax return, he reported nonpassive losses from Schedule K-1 of $122,867 and passive and nonpassive income from Schedule K-1 of

$8,939. This resulted in a loss on Schedule E of $113,928. On Schedule 2, petitioner reported that $104,675 of the $122,867 nonpassive losses was from Farm & Grove. After adjusting for $24,600 in income reported on Form 1099-MISC, Miscellaneous Income, and $597 in interest income, petitioner reported a negative adjusted gross income of $89,269[38] on page 1 of his 1992 Federal income tax return.

On his 1993 income tax return, petitioner claimed a net operating loss carryover deduction of $179,937. On a supporting schedule for line 22, other income, petitioner included a statement showing that the $179,937 claimed deduction was the sum of an alleged $90,071[39] loss in 1990 and an alleged $89,866 loss in 1992.[40]

Petitioner's amended income tax return for 1991 removed the net operating loss carryforward deduction he had claimed on his original 1991 Federal income tax return. The amended 1991 tax return bore the notation that the 1990 net operating loss had been carried back in full to 1988 and 1989.

B. Discussion

Respondent increased petitioner's 1993 gross income by disallowing a $179,937 net operating loss carryforward

---

[38]We note that $597 + $24,600 + ($113,928) = ($88,731).

[39]It is unclear how petitioner arrived at this amount.

[40]It is unclear how petitioner arrived at this amount.

deduction.[41]  Petitioner's deduction was based on alleged losses in 1990 and 1992.

According to respondent, the adjustments reflected in the notice of deficiency, many of which have been conceded by petitioner, disclose that petitioner's income in 1990 and 1992 was in amounts sufficient to absorb the claimed net operating loss carryforward.  Thus, petitioner would not be entitled to a net operating loss deduction in 1993.

The loss reported by petitioner for 1990 principally involved a flow-through loss from Farm & Grove.  Petitioner reported an $82,892 loss from Farm & Grove in 1990.  After accounting for issues conceded by the parties, issues considered conceded under Rule 34(b)(4), and the fact that we sustained one of respondent's determinations regarding the sale of lots to Kiddies-CKE 38 partnership, petitioner's distributive share of income from Farm & Grove in 1990 is $104,636, not an $82,892 loss as reported.[42]

The loss reported by petitioner for 1992 also principally involved a flow-through loss from Farm & Grove.  Petitioner reported a $104,675 loss from Farm & Grove in 1992 but concedes

---

[41]A net operating loss deduction is the excess of allowable deductions over gross income, computed under the law in effect for the loss year, with the required adjustments.  Sec. 172(c) and (d).

[42]See appendix D.

that his loss from this entity in 1992 was only $7,083, which is the same amount of loss that respondent determined in the notice of deficiency.

We agree with respondent that all these adjustments and concessions should be taken into account. When that is done, it is clear that there are no losses in 1990 and 1992 that are available to be carried forward to 1993 pursuant to section 172.

V.   Issue 5.  Casualty Loss

A.   Background

On October 2, 1991, petitioner's son Brian Tietig, who was 17 years old at the time, discovered that a theft and extensive vandalism had occurred at the Miami property. Brian Tietig called the Metro-Dade Police Department and reported the crime on that date. Petitioner completed a property loss report for the Metro-Dade Police Department on January 20, 1992. Petitioner gave what he considered the "replacement costs" of the property stolen from his house in the property loss report he signed on January 20, 1992.

Petitioner brought a lawsuit against TransAmerica Premier Insurance Co. (TransAmerica) in 1992 in the Circuit Court for Brevard County, Florida. Petitioner recovered $1,500 from TransAmerica. Petitioner and TransAmerica executed a Property Damage Release on October 4, 1993. After October 4, 1993,

petitioner no longer had any reasonable prospect of recovering the remainder of the theft loss.

Petitioner reported the loss on his 1993 Federal income tax return. Petitioner claimed on Form 4684, Casualties and Thefts, that the cost or basis of the property stolen was $38,822.

B.   Discussion

Section 165(a) allows as a deduction "any loss sustained during the taxable year and not compensated for by insurance or otherwise".[43]   In general, the amount of the deduction equals the adjusted basis of the property involved.  Sec. 165(b). Petitioner has the burden of proving the adjusted basis of the property.  See Rule 142(a).

Petitioner asserts the proper loss amount is $19,995, while respondent asserts the proper amount of the loss is $20,149 before the limitation imposed by section 165(h)(2).[44]

In determining the amount of petitioner's deduction, respondent accepted petitioner's representations as to the cost or fair market value of all artwork reported stolen and adjusted the business property reported stolen for depreciation.

---

[43]The parties agree that the theft loss was deductible in 1993, not 1991 as originally determined by respondent.

[44]Sec. 165(h)(2) provides that losses from property used for personal purposes are allowed for a taxable year only to the extent that they exceed 10 percent of the adjusted gross income of the individual.  In the present case, petitioner's 1993 adjusted gross income will be determined in a Rule 155 computation.

Respondent then reduced this amount by the $1,500 insurance reimbursement and by $100 in accordance with section 165(h)(1).[45] This brings the allowable loss to $20,149 before application of section 165(h)(2).

Petitioner presented no arguments on brief as to why respondent's computation was incorrect. Petitioner's sole argument regarding the proper amount of the deduction is contained in his reply to respondent's proposed findings of fact, in which he states: "Parties have agreed that the proper loss figure is $19,995." Therefore, respondent's determination is sustained.

## VI. Issue 6. 1990 Self-Employment Tax

### A. Background

Petitioner did not report any self-employment tax due on his 1990 through 1993 Federal individual income tax returns (including the amended returns for 1990 and 1991).

On the Schedule K-1 attached to the 1990 Form 1065 for the 100-lot partnership and the Kiddies 38/91 partnership, petitioner was listed as a general partner. Also on the 1990 and 1991 Schedules K-1 for the same partnerships, petitioner reported that he was entitled to 100 percent of the 100-lot partnership's gains or losses and 75 percent of the Kiddies 38/91 partnership's gains

---

[45]Sec. 165(h)(1) provides that theft losses with respect to personal property must be further reduced by $100.

or losses.  Both partnerships were engaged in the business of selling real estate.

On their 1990 and 1991 Forms 1065, the partnerships reported the following:

|  | 1990 | | 1991 | |
|  | 100-Lot | Kiddies 38/91 | 100-Lot | Kiddies 38/91 |
|---|---|---|---|---|
| Interest income | $15,717 | $21,582.58 | $13,191 | $23,195 |
| Ordinary income | 11,372 | 48,071.84 | (17,339) | 91,092 |
| Guaranteed payments to petitioner as partner | 20,800 | 15,000.00 | 19,200 | 15,100 |

Petitioner provided management services to Eureka Field Nursery during 1991.  Petitioner was paid $6,421 in management fees for the services that he provided Eureka Field Nursery during 1991.

Petitioner managed and acted as a consultant for a number of his S corporations and partnerships, negotiating most, if not all, of their land sales.

On the Kiddies 38/91 Form 1065 for 1993, the partnership reported $52,748 of ordinary income and that it made $8,900 of guaranteed payments to partners.

B.  Discussion

Petitioner argues that he is not subject to the self-employment tax on moneys that he received from the 100-lot and Kiddies 38/91 partnerships in 1990, 1991, and 1993.

Section 1401 provides that a tax shall be imposed, in addition to other taxes, on the self-employment income of every individual. Self-employment income generally includes an individual's net earnings from self-employment in any trade or business, a partner's distributive share of income or loss from any trade or business carried on by a partnership of which he is a member, and guaranteed payments from such a partnership. Sec. 1402; sec. 1.1402(a)-1, Income Tax Regs. Section 1402(a)(2) specifically excludes interest from the term "net earnings from self-employment." Petitioner bears the burden of proving that he is not liable for the self-employment tax. See Rule 142(a).

Petitioner argues that he acted as a mere conduit in collecting funds distributed by the partnerships and that in his role as guardian, he simply transferred the funds to his minor children. Petitioner asserts that he did not have property rights in the funds distributed by the partnerships.

The Federal income tax returns filed on behalf of both partnerships report petitioner's entitlement to a percentage of the profits and losses and guaranteed payments from each partnership. Petitioner has not demonstrated that by virtue of his guardianship role, his rights in the funds distributed by these partnerships were restricted, and he has submitted no evidence that he distributed the money to his minor children.

Petitioner also argues that the only services that he provided were for Farm & Grove. This argument ignores the fact that during the years in issue, petitioner was a general partner at both the 100-lot and the Kiddies 38/91 partnerships. During the years in issue, the partnerships conducted businesses and reported distributing profits and losses as well as guaranteed payments to petitioner. Thus, petitioner is liable for the self-employment tax.

We hold that petitioner is liable for the self-employment tax based on moneys that he received from the 100-lot and Kiddies 38/91 partnerships in 1990, 1991, and 1993.[46]

VII. Issue 7. Flow-Through Adjustment

A. Background

On Schedule K-1 of its 1990 and 1991 Form 1065, the 100-lot partnership reported petitioner's share of income as $11,372 in 1990 and a loss of $17,339 in 1991. Petitioner reported the $11,372 in income from the 100-lot partnership on his amended 1990 Federal income tax return, and he reported the $17,339 loss on his 1991 Federal income tax return.

B. Discussion

Petitioner argues that the reported income and loss from the 100-lot partnership should be stricken from his 1990 and 1991

---

[46]Petitioner is entitled to a deduction in 1990, 1991, and 1993 for paying the self-employment tax. See sec. 164(f).

Federal income tax returns.[47]  Petitioner did not provide any documentation or testimony indicating why his 1990 and 1991 Federal income tax returns should be treated other than as he originally reported them.  Petitioner has not met his burden and established that correcting entries should be made as he asserts.

VIII.  Issue 8.  Accuracy-Related Penalty

A.  Background

Petitioner did not prepare his personal income tax returns or those of the corporations and partnerships in which he held an interest with respect to the years in issue.  Petitioner's employee, Ms. Fox, prepared his tax returns for the years 1990 through 1993.  In preparing the returns, Ms. Fox had assistance from an outside accountant in each year.

In preparing the returns, Ms. Fox had access to petitioner's business files in the Brevard County office.  Petitioner was not customarily in the Brevard County office when Ms. Fox was preparing the returns.

Ms. Fox collected the information to be placed on the return, and petitioner was available to speak to her and the assisting accountant in the event they had questions concerning an item of income or a transaction.

_____

[47]This issue does not relate to an adjustment made in the notice of deficiency.  Instead, it relates to a claim that petitioner initially made in his petition.

No preparer is listed in the signature block on any of the initial Federal income tax returns or the amended income tax returns for the years in issue.

B. <u>Discussion</u>

Respondent determined that petitioner is liable for an accuracy-related penalty under section 6662(a) for the years 1990, 1991, 1992, and 1993. Section 6662(a) imposes a penalty in an amount equal to 20 percent of the portion of the underpayment of tax attributable to a taxpayer's negligence or disregard of rules or regulations. Sec. 6662(a) and (b)(1).

Section 6662(c) provides that the term "negligence" includes any failure to make a reasonable attempt to comply with the provisions of the Internal Revenue Code, and the term "disregard" includes any careless, reckless, or intentional disregard of rules or regulations. The Commissioner's determination that a taxpayer was negligent is presumptively correct, and the burden is on the taxpayer to show lack of negligence. <u>Hall v. Commissioner</u>, 729 F.2d 632, 635 (9th Cir. 1984), affg. T.C. Memo. 1982-337.

Petitioner asserts that he relied upon Ms. Fox to prepare his Federal income tax returns. A taxpayer cannot avoid its duty to file accurate returns by shifting responsibility to its bookkeeper or its employee when the taxpayer makes an inadequate effort to see that the books and records are being kept

correctly.  Leroy Jewelry Co., Inc. v. Commissioner, 36 T.C. 443, 445 (1961).  In the instant case, petitioner did not present sufficient evidence to justify a finding that the accuracy-related penalty for negligence is not applicable.  In addition to the several holdings in this opinion in favor of respondent, petitioner conceded[48] that several income items representing substantial amounts were omitted from his Federal income tax returns.  Such omissions included the failure to report substantial amounts of interest income, a guaranteed payment from a partnership, taxable Social Security benefits, and distributive shares of income from S corporations.  These omissions were due to errors petitioner did not attempt to check.

No accuracy-related penalty shall be imposed with respect to any portion of an underpayment if it is shown that there was reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion.  Sec. 6664(c)(1). Petitioner argues that he also relied upon outside accountants and, thus, he should not be liable for the accuracy-related penalty.  In order for a taxpayer's reliance on advice to be reasonable so as to negate a section 6662(a) accuracy-related penalty, this Court requires that the taxpayer prove by a preponderance of the evidence that the adviser was a competent professional who had sufficient expertise to justify reliance;

---

[48]See appendixes A and B.

the taxpayer gave to the adviser the necessary and accurate information; and the taxpayer actually relied in good faith on the adviser's judgment. Neonatology Associates, P.A. v. Commissioner, 115 T.C. 43, 99 (2000).

We are not convinced that petitioner reasonably relied on his outside accountant in reporting the items in issue. The record does not contain evidence of what specific information petitioner provided the outside accountant. Indeed, it was Ms. Fox who provided the information to the outside accountant. Petitioner has not established that the incorrect returns were the result of advice provided by the outside accountant. Accordingly, we find that petitioner has failed to prove that any portion of his underpayments was due to reasonable cause or that substantial authority existed for his various tax positions.

Petitioner also argues that he is protected by the automatic stay provision of 11 U.S.C. sec. 362 (1994) from the accuracy-related penalty for negligence. As a general rule, the filing of a petition in bankruptcy operates to stay the commencement or continuation of any action or proceeding against the debtor. 11 U.S.C. sec. 362(a) (1994). However, 11 U.S.C. sec. 362(b)(9) (1994) provides an exception to the automatic stay for audits conducted by the Government to determine tax liability. We find that petitioner's involvement in a bankruptcy proceeding did not prevent respondent from determining that petitioner was liable

for the accuracy-related penalty pursuant to section 6662(a) and (b)(1).

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.

APPENDIX A

All the following issues were conceded by the parties in the stipulation of settled issues.

Petitioner concedes that he had unreported interest income of $42,175 in 1990, $41,734 in 1991, $21,251 in 1992, and $40,724 in 1993.  Petitioner concedes that he received taxable management fee income of $6,420.70 from Eureka Field Nursery during 1991. Petitioner concedes that his flow-through loss from the S corporation Villa Sol during 1990 was $750.  Additionally, petitioner concedes that his distributive share from the S corporation Brevard Specialities was $2,531 in 1990, $800 in 1991, and $535 in 1992.

Petitioner concedes that he did not report a $19,200 guaranteed payment from a partnership in 1991.  Petitioner concedes that he received taxable Social Security benefits (subject to Code limitations) of $3,371.50 in 1991 and $3,816 in 1992.

Petitioner concedes that he realized a capital gain of $23,865.68 as a result of the condemnation by the Florida Department of Transportation of .46 acres petitioner owned in 1992.  Petitioner concedes that he received a short-term capital gain of $225 from the closing out of the bank account of Eureka Field Nursery in 1992.

Petitioner concedes that he is liable for the addition to tax pursuant to section 6651(a)(1) relating to 1990 and 1993, if there is any tax due for those years before the application of any net operating losses from other years.

Respondent concedes that petitioner is entitled to an itemized deduction for investment interest of $26,750 in 1991, $20,309 in 1992, and $10,022 in 1993. Respondent also concedes that a $54,229.76 payment by Eureka Field Nursery to Mark Tietig in 1991 was not a distribution to petitioner, that it does not reduce petitioner's basis in Eureka Field Nursery stock, and that it does not reduce the loans owed petitioner by Eureka Field Nursery.

APPENDIX B

All the following issues were either conceded on brief or deemed conceded.

Respondent concedes that Eureka Field Nursery's $54,229.76 payment to Mark E. Tietig was a return of capital to Mark Tietig and therefore should be excluded from the computation of petitioner's gain from Eureka Field Nursery.  Respondent also concedes that the $54,229.76 did not actually belong to Eureka Field Nursery but instead to the joint venture entered into by Eureka Field Nursery and Mark Tietig.  Respondent concedes that the $54,229.76 was not income to Eureka Field Nursery. Respondent concedes that the subsequent transfer of this amount to Mark Tietig was not really a payment to Mark Tietig by Eureka Field Nursery of money it had earned but a distribution from the joint venture to Mark Tietig.  Respondent concedes that the $54,229.76 payment should not be included in the calculation of petitioner's distributive share from Eureka Field Nursery in 1991.

Respondent determined that petitioner's distributive share of income from Farm & Grove should be increased by $1,755 in 1990 because of realized gains on foreclosed properties.  Petitioner did not specifically allege an error by respondent regarding this issue in his petition.  Thus, we consider the issue conceded. See Rule 34(b)(4).

We note that in petitioner's reply brief, he considers several issues conceded.  We list below all the issues that petitioner considered conceded in his reply brief.

The $1,755 gain in 1990 due to realized gains on foreclosed properties was not listed as one of the issues not in controversy.  Another issue, gain on the sale of 53 lots, was conceded by petitioner in his reply brief because it was not petitioned.  However, in his petition, petitioner alleged error by respondent on the sale of the 53 lots and argued the issue in his brief and reply brief.  In light of the inconsistency, we shall view the matter in the light most favorable to petitioner, and we consider his arguments in the opinion.

With respect to the other issues considered not in controversy by petitioner in his reply brief, we consider the following issues conceded.

Petitioner concedes that in 1990, Farm & Grove earned income of $168,567 on account of installment sales made during 1989. Petitioner concedes that in 1990, Farm & Grove earned income of $50,987 on account of installment sales made during 1990.

Petitioner concedes that his distributive share of income from Farm & Grove in 1991 is a loss of $97,501, in 1992 is a loss of $7,083, and in 1993 is a loss of $75,072.

Petitioner concedes that he is liable for an $8,259 self-employment tax in 1991 and a $6,848 self-employment tax in 1993.

Petitioner concedes that he is not entitled to a net operating loss deduction in 1991 stemming from his 1990 tax year.

In his petition, petitioner asserted that he filed a Form 1040, U.S. Individual Income Tax Return, for the year 1994, which resulted in a net operating loss eligible for carryback to 1991 of $253,889. The notice of deficiency did not cover 1994, and petitioner on brief has abandoned this assertion. Indeed, petitioner listed this issue as one of the issues he considered "not in controversy" in his reply brief. Therefore, we consider the issue conceded.

Respondent concedes that petitioner is entitled to self-employment tax deductions for the years 1990, 1991, and 1993.

Petitioner concedes that he had interest income from Eureka Field Nursery of $33,043 in 1991.

Petitioner concedes that the correct amount of flow-through income from the Kiddies 38/91 partnership during 1991 is $83,419.

Petitioner concedes that his distributive share from Eureka Field Nursery in 1990 is $43.

The parties agree on the formula to be used for calculating interest due under section 453(l)(3) for the years 1990, 1991, and 1992. The parties also agree that deductions allowed petitioner for interest paid pursuant to section 453(l)(3) for the years 1990, 1991, and 1992 will be determined under a Rule 155 computation.

Finally, petitioner asserted in his petition that a deduction is allowable for 1990 for an unprocessed claim for refund filed with the Internal Revenue Service.  Petitioner introduced no evidence at trial regarding this issue, and petitioner's opening and reply briefs make no reference to this issue.  Since this possible issue was not argued on brief, it is deemed conceded.  See Money v. Commissioner, 89 T.C. 46 (1987).

APPENDIX C

Mark E. Tietig
Accounting

| | | | | | | |
|---|---|---|---|---|---|---|
| Beginning Balance | | | | | | $445,000 |
| Payment | EFN | 104 | 6/6/91 | [1]54,230 | | 390,770 |
| Payment | MET | 195 | 9/19/91 | 5,000 | | 385,770 |
| Payment | MET | 206 | 2/6/92 | 5,000 | | 380,770 |
| Cadallac | | | | 2,400 | | 378,370 |
| Kluger | | | | 7,000 | | 371,370 |

_____

_____
Per Agreement          Balance as of 8/5/92  $371,600

| Installment Due Date | Check No. | Monthly Amount | Owed | Paid | Balance |
|---|---|---|---|---|---|
| 92 November | | 5,000 | 5,000 | 5,000 | 366,600 |
| December | | 5,000 | 10,000 | 5,000 | 361,600 |
| | | | | | |
| 93 January | | 5,000 | 15,000 | 5,000 | 356,600 |
| February | | 5,000 | 20,000 | 5,000 | 351,600 |
| March Partial | | 5,000 | | 820 | 350,780 |
| 9-21-92 P-7105 | | | | | |
| Osceola County | | | | 20,820 | |
| 3-8-93 | | | | | |
| Bal. March | 1005 | 5,000 | 4,180 | 4,180 | 346,600 |
| 4-5-93 April | 1007 | 5,000 | 5,000 | 5,000 | 341,600 |
| 5-6-93 May | | 5,000 | 5,000 | 5,000 | 336,600 |
| 6-8 June | 1012 | 5,000 | 5,000 | | |
| 6-8 July | 1012 | 5,000 | 10,000 | | |
| 6-8 Payment | Find | | | 10,000 | 326,600 |
| 8-5 August | 1013 | 5,000 | 5,000 | 5,000 | 321,600 |
| 9-5 September | 1014 | 5,000 | 5,000 | 5,000 | 316,600 |
| 10-5 October | 1015 | 5,000 | 5,000 | 5,000 | 311,600 |
| 11-5 November | 1016 | 5,000 | 5,000 | 5,000 | 306,600 |
| 12-5 December | 1017 | 5,000 | 5,000 | 5,000 | 301,600 |
| | | | | | |
| 1-5-94 Jan. | 1018 | 5,000 | 5,000 | 5,000 | 296,600 |
| 2-5 Feb. | 1019 | 5,000 | 5,000 | 5,000 | 291,600 |
| 3-5 March | | 5,000 | 5,000 | 5,000 | 286,600 |
| 4-5 April | | 5,000 | 5,000 | 5,000 | 281,600 |
| 5-5 May | | 5,000 | 5,000 | 5,000 | 276,600 |
| 6-5 June | | 5,000 | 5,000 | 5,000 | 271,600 |
| 6-27 Payment | | | | 271,500 | 100 |

Paid in Full

[1]All figures are rounded to the nearest dollar.

APPENDIX D

Below we compare the notice of deficiency adjustments to Farm & Grove's 1990 income with the final treatment per the concessions and our findings.

|  | TYE 12/31/90 | Final Treatment |
|---|---|---|
| Ordinary income per return as filed | ($82,892) | |
| Increases (Decreases) to income: | | |
| a.  1989 installment sales | 168,587 | [1]168,587 |
| b.  Current years installment sales | 50,987 | [2]50,987 |
| c.  Gain on foreclosures | 1,755 | [3]1,755 |
| d.  K-38 lot sales | 215,922 | [4]215,922 |
| e.  Less amounts reported | (249,723) | (249,723) |
| Ordinary income as corrected | 104,636 | 104,636 |
| Your distributive share of ordinary income | 104,636 | 104,636 |
| Less:  Ordinary income reported on your return | (82,892) | (82,892) |
| Increase (Decrease) in taxable income | 187,528 | 187,528 |

---

[1]Conceded.

[2]Conceded.

[3]Considered conceded per Rule 34(b)(4).

[4]Respondent's determination sustained.